175 N.J. Super. 53 (1980)
417 A.2d 575
IN THE MATTER OF THE APPLICATION OF MEADOWLANDS COMMUNICATIONS SYSTEMS, INC. FOR CERTIFICATES OF APPROVAL IN THE MUNICIPALITIES OF EAST RUTHERFORD, CARLSTADT, LYNDHURST, EAST NEWARK, NORTH ARLINGTON AND RUTHERFORD AND THE APPLICATION OF WEST HUDSON COMMUNICATIONS SYSTEMS, INC. FOR A CERTIFICATE OF APPROVAL IN THE TOWN OF KEARNY. IN THE MATTER OF THE PETITION OF MEADOWLANDS COMMUNICATIONS SYSTEMS, INC. AND WEST HUDSON COMMUNICATIONS SYSTEMS, INC. FOR AUTHORITY TO TRANSFER CAPITAL STOCK ON ITS BOOKS. IN THE MATTER OF THE PETITION OF KALEIDOSCOPE CABLE T.V., INC. ALLEGING ARBITRARY REFUSAL IN THE TOWN OF KEARNY. IN THE MATTER OF THE APPLICATION OF MICRO-CABLE COMMUNICATIONS CORPORATION D/B/A UA-COLUMBIA CABLEVISION OF NEW JERSEY FOR A CERTIFICATE OF APPROVAL IN THE MUNICIPALITIES OF LYNDHURST, CARLSTADT, RUTHERFORD, EAST RUTHERFORD AND NORTH ARLINGTON.
Superior Court of New Jersey, Appellate Division.
Submitted April 15, 1980.
Decided July 9, 1980.
*57 Before Judges MATTHEWS, ARD and POLOW.
Greenwood, Weiss & Shain, attorneys for plaintiff Suburban Cablevision (Robert H. Greenwood, of counsel and on the brief).
Meyner & Landis, attorneys for respondent Meadowlands Communications Systems, Inc.
Norman A. Doyle, Jr., attorney for Town of Kearny filed a statement in lieu of brief.
John J. Degnan, Attorney General of New Jersey, attorney for Board of Public Utilities, filed a statement in lieu of brief (Nielson V. Lewis, Deputy Attorney General, of counsel).
Carella, Bain, Gilfillan & Rhodes, attorneys for plaintiff UA-Columbia Cablevision of New Jersey.
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
Appellants UA-Columbia Cablevision of New Jersey (UA-Columbia) and Suburban Cablevision (Suburban) appeal from an order of the Board of Public Utility Commissioners (Board) granting certificates of approval to Meadowlands Communications Systems, Inc. (Meadowlands) to construct and operate a cable television system in seven Bergen and Hudson County communities. UA-Columbia appeals the issuance of certificates of approval to Meadowlands for the communities of North Arlington, Lyndhurst, Rutherford, East Rutherford and Carlstadt in Bergen County. Suburban appeals the decision as to Kearny and East Newark located in Hudson County.
*58 There is no dispute as to the facts in this case  only the Board's interpretation of those facts. Three cable television companies are contending for the right to own and operate cable television systems in seven Bergen and Hudson County communities. The primary issues are arbitrary denial of municipal consents and regionalization.
Meadowlands Communications Systems, Inc. and West Hudson Communications Systems, Inc. are recently established cable television companies. Guy Savino, a native of Lyndhurst, is the president, founder and sole owner of the stock of both corporations. According to Savino, the corporations were established to provide a communication network in Kearny and the Meadowlands peninsula. The underlying concept was to create a system in which local residents and civic leaders would be able to present local origination programs over the cable television network. That was the actual premise on which Meadowlands presented its successful application to the subject communities. It readily admits that it was not chosen to build the cable T.V. system on the basis of its technical or financial strength.
Comcast, with headquarters in Bala-Cynwyd, a suburb of Philadelphia, is a publicly held corporation with an annual volume of business upwards of $12 million. Currently, 70% of its assets are invested in the cable television business. Comcast operates ten cable T.V. systems servicing approximately 70,000 subscribers in some 26 municipalities across the United States. Comcast currently has an agreement with Meadowlands to purchase 85% of Meadowlands' stock, provided that the Board approves the transfer and grants certificates of approval for the construction of cable T.V. systems in all seven communities. Comcast would then provide the financing to build the system. It appears that the day-to-day operation of the system would remain in the hands of Savino.
UA-Columbia is a nationwide multi-system operator that has been operating in New Jersey since 1970-71. At the time of the hearings UA-Columbia had completed construction on 14 cable television franchises throughout northern New Jersey. At the municipal hearings UA-Columbia primarily stressed its technical *59 and financial capability to build and operate a cable television system.
Suburban Cablevision, at the time of the hearings, was a cable television company serving some 22,000 subscribers in Essex and Hudson Counties. MacLean-Hunter Cable Television Limited, a Toronto based firm, owns 75% of the stock of the corporation and provides the financial backing for the construction of the cable T.V. systems. Suburban currently operates a system in Harrison, which is immediately adjacent to Kearny.
Meadowlands and UA-Columbia both first applied for municipal consents in the communities of Lyndhurst, North Arlington, Rutherford, East Rutherford and Carlstadt in 1973. Despite a strong presentation by UA-Columbia as to its financial and technical capability to build a cable television system and the introduction of a letter from the office of Cable Television stating that Meadowlands was financially unable to build a system, UA-Columbia did not receive any municipal consents.
Suburban and Meadowlands were the principal contenders for the municipal consents in East Newark and Kearny. Again, despite its lack of experience in the cable television business, Meadowlands received consents in both communities.
Following receipt of the municipal consents Meadowlands began the search for the financial and technical support needed to construct a cable television system. Meadowlands spent approximately $54,000 in this effort. However, it had little success until January 1976 when Meadowlands received a loan offer from Fidelity Union Trust Company for $1.6 million. Having received the necessary financial support for the construction of a cable television system, Meadowlands filed its applications for certificates of approval with the Board of Public Utilities pursuant to N.J.S.A. 48:5A-15 on March 12, 1976. Seven days later the Office of Cable T.V. (OCTV) advised Meadowlands that "[t]he municipal consents involved are . . no longer effective." The basis for that decision was the recently promulgated regulations (N.J.A.C. 14:18-11.19 and 11.-23) which required holders of municipal consents granted prior *60 to the effective date of the regulations to file for certificates of approval within 30 days after the effective date of the regulations (December 18, 1975). The OCTV advised each affected municipality of the invalidity of the Meadowlands' consents.
Meadowlands sought and obtained an extension of time until June 1, 1976 to satisfy OCTV as to the viability of its plans and to persuade OCTV to accept the petitions for certificates of approval. Meadowlands subsequently advised Kearny of this extension and a further possible extension in a letter dated June 2, 1976.
Following receipt of the extension for consideration, Fidelity Union advised Meadowlands that it was cancelling the $1.6 million loan offer. The reason for the decision was not the uncertainty of the Meadowlands' petitions, but rather, a decision by the bank not to pursue any CATV loans. That action left Meadowlands with no financial backing to pursue the cable T.V. system.
Kearny requested a firm statement from the Board as to the viability of the Meadowlands' application on June 8, 1976.
On June 29, 1976 the OCTV advised Meadowlands that no further extensions would be granted, and since Meadowlands had not been able to present additional information as to its financial status, the franchises (or municipal consents) were deemed null and void. Kearny was advised of that decision on July 1, 1976.
The OCTV reversed its decision as to the Meadowlands' petitions on July 12, 1976. At that time the OCTV concluded that the March 12 petitions had been timely filed since the time periods in the regulations did not begin to run until January 21, 1976, the date the regulations were filed with the Secretary of State. The OCTV would now consider the Meadowlands' applications on their merits. The OCTV forwarded copies of this letter to all seven municipalities, including Kearny.
Meadowlands subsequently filed supplementary information on July 20, 1976. Meadowlands also filed a petition seeking permission to transfer 85% of its common stock to a wholly-owned *61 subsidiary of Comcast Corporation. (An agreement to this effect between Comcast and Meadowlands was executed on November 12 (or 17), 1976.)
Despite the assurances from the OCTV that the Meadowlands' applications would now be considered, Kearny began proceedings to repeal Meadowlands' municipal consents on July 14, 1976, and the municipal consent ordinance was repealed on August 11, 1976.
On October 20, 1976, the night before the commencement of OCTV hearings on Meadowlands' applications for certificates of approval, Kearny held a hearing on the recently filed application of Suburban. Despite objections by Meadowlands as to the propriety of the proceedings, the Kearny mayor and council allowed Suburban to proceed with its presentation. Subsequently, on November 10, 1976, Kearny adopted a resolution awarding the municipal consent to Suburban. An ordinance to this effect was adopted on December 22, 1976.
Hearings on Meadowlands' petitions for certificates of approval began on September 21, 1976 with the first testimony heard on October 21, 1976. UA-Columbia filed its petitions alleging arbitrary denial on November 19, 1976 after the hearings began. In its brief UA-Columbia admits that it did not file these petitions until it saw the problems Meadowlands had in obtaining financing and the vacillation by the OCTV with respect to the validity or invalidity of the Meadowlands' municipal consents.
During the course of the hearings, Kearny and Suburban moved to dismiss the Meadowlands' petition with regards to Kearny on the grounds that Kearny had revoked the Meadowlands' consent. The hearing examiner recommended dismissal of the motion on the ground that even assuming that Kearny effectively revoked the Meadowlands' consent, N.J.S.A. 48:5A-17(b) gives the Board authority to grant certificates of approval in the absence of municipal consents. Regionalization allows the Board to overturn municipal consents.
*62 The consolidated hearings resumed following issuance of this report. They continued until May 26, 1977. Following the conclusion of the hearings the hearing examiner issued his report on November 2, 1977. He recommended that certificates of approval be granted to Meadowlands for all seven communities. He ruled that UA-Columbia was estopped because of laches from filing a petition for a certificate of approval grounded in a claim of arbitrary refusal. Despite this ruling, the hearing examiner went on to rule that the municipalities' decision to award the municipal consents to Meadowlands and not UA-Columbia was not arbitrary.
The hearing examiner further found little difference in the cost of service, quality of service and speed of service among the three cable companies. As a result, the hearing examiner was reluctant to overturn validly-issued municipal consents. Thus, although the hearing examiner did not find that the seven communities constituted a region in the sense of community of interest, he awarded all seven communities to Meadowlands because all seven were necessary to make the system economically viable to Meadowlands and Comcast would withdraw its financial support if Kearny was not included. One last consideration in the hearing examiner's decision was that the award of all seven to Meadowlands would result in the overturning of the fewest number of municipal consents.
The Board of Public Utilities adopted the hearing examiner's decision with minor modifications.
The Town of Kearny submitted a statement in lieu of brief in which it expressed its consent to and support of the hearing examiner's report and recommendations.

I
UA-Columbia first argues that the hearing examiner and the Board erred in dismissing its petitions for certificates of approval on the ground of laches. UA-Columbia argues that it properly relied on the fact that N.J.S.A. 48:5A-17(d), the "arbitrary denial" section of the Cable Television Act, does not contain any *63 time limits on the filing of such petitions. Furthermore, it points out that the Board of Public Utilities did not adopt a rule requiring the filing of such actions within 30 days after municipal action until after the conclusion of this matter. (N.J.A.C. 14:18-11.19(b), effective August 16, 1977).
The doctrine of "[l]aches can be a defense only where there is a delay, unexplained and inexcusable, in enforcing a known right and prejudice has resulted to the other party because of such delay." Flammia v. Maller, 66 N.J. Super. 440, 454 (App.Div. 1961). It is an equitable defense and both elements must be present for the defense to apply. Allstate v. Howard Savings Inst., 127 N.J. Super. 479, 489-490 (Ch.Div. 1974).
It is undisputed that UA-Columbia waited almost three years from the date of the first municipal consent (February 19, 1974) before filing its arbitrary denial petitions. Furthermore, it presents no justification for this delay beyond asserting that N.J.S.A. 48:5A-17(d) does not contain any specific time limits. All indications are that UA-Columbia did not decide to contest the municipal consents until it saw the financial and administrative difficulties Meadowlands had in perfecting its plans for the cable television system. Thus, it unreasonably delayed asserting a known right.
UA-Columbia argues that Meadowlands cannot assert the defense of laches as it acquiesced in and contributed to the delay by not filing for certificates of approval until March 1976. However, UA-Columbia ignores the fact that its right to file a petition based on arbitrary refusal was not dependent on Meadowlands filing for certificates of approval. UA-Columbia could have filed its petition at any time. N.J.S.A. 48:5A-17(d). Furthermore, any delay in Meadowlands filing its petition could not and did not prejudice UA-Columbia.
Mere inexcusable lapse of time does not justify application of the defense of laches. Prejudice to the party asserting laches because of the delay must be shown. The hearing examiner found, and the Board agreed, that Meadowlands justifiably *64 relied on the lack of opposition to its municipal consents in expending significant sums of money towards the construction of the cable television system. We do not agree with that conclusion. A municipal consent is only the first step in the proceedings. Meadowlands could not proceed with complete assurance until it obtained a certificate of approval from the Board. N.J.S.A. 48:5A-15. Thus, despite the lapse of time, Meadowlands cannot be said to have been prejudiced by the delay. A valid and effective consent does not guarantee that the petitioner will be able to build a system. Since Meadowlands was not prejudiced by the delay, the defense of laches does not apply.
The hearing examiner and the Board found additional justification in the fact that the passage of time made it difficult to reconstruct the municipal deliberations. No stenographic transcripts were made at the time and memories of the events would not be reliable. Secondly, the hearing examiner believed that it would be difficult to determine if the municipalities abused their discretion in selecting a start-up company. Yet, as its financial position has changed in the intervening years, it would not be fair to Meadowlands to evaluate it as of 1974.
The Board has adopted the judicial standard of review of municipal decisions set out in the zoning case of Kramer v. Sea Girt Bd. of Adj., 45 N.J. 268 (1965): that the law presumes local public bodies will act fairly, with proper motives and for valid reasons. Thus, a local determination will only be set aside when it is arbitrary, capricious or unreasonable. Even if there is some doubt as to the wisdom of the actions, there can be no judicial declaration of invalidity in the absence of a clear abuse of discretion by the public agencies involved.
The hearing examiner found that the municipalities involved did not abuse their discretion in selecting a start-up company rather than an established company. He based this decision on his reading of the statute and the legislative policies contained therein.
*65 In our evaluation of that decision, the agency determination is entitled to great weight, with due regard given to the agency's expertise on the subject. However, we are not bound by the agency's interpretation of the statute or its determination of a strictly legal issue. In re Application of Saddle River, 71 N.J. 14, 24 (1976); Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 93 (1973); Infocomp Corp. v. Somerset Trust Co., 165 N.J. Super. 382, 391 (App.Div. 1979).
In arguing that it was arbitrary for the municipalities to select Meadowlands as opposed to UA-Columbia, UA-Columbia contends that although the cable T.V. statute's definition of a cable television system includes proposed systems (N.J.S.A. 48:5A-2(d)), a reading of the statute in its entirety shows that an applicant must have the backing and support to transform what may be merely a dream or idea into a tangible and operational system, and this support must be substantially evidenced at the time of the municipal hearing. UA-Columbia contends that Meadowlands did not have the necessary technical and financial support at the time of the municipal hearings, nor did it have the necessary support at the time of its application for certificates of approval.
The hearing examiner rejected this argument as frivolous, stating that in essence it would require an applicant to be an existing, operating system within New Jersey. We agree with the hearing examiner that despite UA-Columbia's protestations to the contrary, this would be the actual effect of holding that in this circumstance it was arbitrary for the municipalities to reject UA-Columbia's application.
In construing statutes a court's initial concern is to seek the legislative intent. To that end we should consider any legislative history which may be of aid. State v. Madden, 61 N.J. 377, 389 (1972).
In enacting the Cable Television Act (N.J.S.A. 48:5A-1 et seq.), the Legislature declared that the State's policy was "to provide fair regulation of cable television companies in the interest of the public." N.J.S.A. 48:5A-2(b). One object of the *66 act was to "protect the interests of the several municipalities of this State in relation to the issuance of municipal consents for the operation of cable television companies...." N.J.S.A. 48:5A-2(c)(5).
The CATV Study Commission, in its report issued in January 1972, had found that a major problem was delays in implementation of service resulting from the awarding of franchises to inadequately financed or technically incompetent companies. Often these companies gambled on the potency of the franchise itself to attract the necessary financing and technical expertise. CATV Report at 31-32.
As a result, the Legislature established a two-tiered approval process. First, a company must obtain a municipal consent. N.J.S.A. 48:5A-22. Second, the company has to file for a certificate of approval from the Board of Public Utilities. N.J.S.A. 48:5A-15. At both levels the company must establish its financial and technical qualifications to operate a cable T.V. system. N.J.S.A. 48:5A-17(a) and N.J.S.A. 48:5A-28(c).
The situation presented here represents a good example of the problem the Legislature hoped to avoid in passing this act. At the time it received the municipal consents Meadowlands had minimal financial and technical capability to construct the cable system. Despite the award of the municipal consents, Meadowlands was unable to begin construction immediately. It spent almost 2 1/2 years searching for the technical and financial backing to build the system. (From February 1974, the date of the first agreement, to November 1976, the date of the agreement with Comcast.) The municipalities are still without cable T.V. service, six years after the initial grant of the municipal consents.
We cannot, however, undo the delays of the past. Such delays can probably be avoided in the future by the requirement that petitions for certificates of approval must be filed within 30 days of the acceptance of a municipal consent (which must be within ten days of final passage of the ordinance (N.J.A.C. 14:18-11.19). In addition, the two-tiered approval process provides *67 the safety mechanism to insure that only financially and technically capable companies are granted municipal consents.
Meadowlands, through its agreement with Comcast, now has the financial and technical capability to build the cable T.V. system. The direct testimony of James R. Holston, an accountant with the Office of Cable Television, specifically concluded that all three companies had the financial capacity to build the proposed systems.
UA-Columbia and Suburban argue that due to the contingent and speculative nature of the agreement between Comcast and Meadowlands, the Board should only look to the financial capability of Meadowlands in making its determination. We disagree. As argued by Meadowlands, the contingent and speculative nature of the agreement revolves around the principal contingency of Meadowlands receiving all sought after certificates of approval. We believe that the Board's decision in this matter has satisfied that contingency.
The decisions by these municipalities to select Meadowlands were not arbitrary. The municipalities appear to have made an honest value judgment that a local company run by local citizens (which is still true despite the agreement with Comcast) was in the circumstances a better choice than an established company. Such a local company might better serve the legislative purpose of promoting the community service potentials of the cable television medium. (N.J.S.A. 48:5A-2). Subsequent events have shown that this decision was probably not a wise one, but an unwise decision is not necessarily an arbitrary decision.
Through this decision the Board encourages competition in the cable T.V. industry. That policy decision does not contravene the legislative policies of the Cable Television Act.

II
The critical section of the Cable Television Act for most of the Suburban argument is N.J.S.A. 48:5A-17(b), known in the industry as the "regionalization" section. The argument is also raised by UA-Columbia. The section permits the Board to issue *68 certificates of approval to neighboring areas without municipal consents in certain circumstances. The provision directs that:
In considering any such application, the board shall take into consideration the probable effects upon both the area for which certification is sought and neighboring areas not covered in the municipal consents; and if it finds that the probable effects, for technical and financial reasons, would be to impede the development of adequate cable television service, or create an unreasonable duplication of services likely to be detrimental to the development of adequate cable television service in any area either within or without the area for which certification is sought, it may deny the certificate or it may amend the certificate in issuing it so as to
(1) direct that areas covered in the application be excluded from the area certified, or
(2) direct that areas not covered in the application be included in the area certified.
It is first argued that the Board erred in basing its determination upon consideration of the "economic impact" on a private corporation rather than on the public to be served.
During the course of the hearings, Comcast made it quite clear that unless Kearny was included within the system, it would not advance any financial support to Meadowlands. The net result would be the demise of Meadowlands, as it appears all other sources of financial support have been exhausted. The Board ordered the issuance of certificates of approval to Meadowlands for Kearny and East Newark, despite the fact that Meadowlands probably did not hold valid consents in those communities, on "regionalization" grounds. In doing so, the Board stated: "Without Kearny, Meadowlands would cease to exist as a viable entity, and this Board would have effected the overturning of either seven or five municipal consents."
Suburban and UA-Columbia argue that, as proven cable television companies, they are ready and willing to serve the residents of these communities. Suburban argues that the Board should be concerned with providing high quality service to the public, not with ensuring the private welfare of a private corporation. Although it might appear that the Board is in effect allowing a private company to define a region, that is the net result of the current statutory scheme: cable companies can pick which communities they desire to enter, thus in effect defining their own region.
*69 Suburban's principle argument is that the Board misapplied the regionalization concept. Suburban advances several points in support of this contention. First it argues that the hearing examiner erred in accepting Comcast's contention that the system was not viable without Kearny. Second, Suburban maintains that the hearing examiner misconceived and misapplied the "regionalization" statute.
The hearing examiner found that Kearny is absolutely necessary to Meadowlands as it represents 32% of the whole system under dispute.
There was contradictory data in the record as to the viability of a cable T.V. system with and without Kearny. Meadowlands presented extensive financial projections to prove that Kearny is economically necessary to the system. (We note that those financial calculations are probably completely outdated in light of the recent changes in the economy.) Suburban points to testimony that there might be other viable systems in New Jersey that are the size that the one proposed here would be without Kearny.
The number of homes needed to make a system viable is an issue that should be left to those with at least some degree of expertise in this area (i.e., the Board). Despite contradictory testimony, there is sufficient credible evidence to support the hearer's finding.
Suburban next argues that the hearing examiner misconceived the regionalization statute. According to the terms of the statute itself, the authority of the Board to deal with "areas not covered in the application" depends upon finding one of two "probable effects, for technical and financial reasons": (1) the impairment of the development of cable television service or (2) the creation of "an unreasonable duplication of services likely to be detrimental to the development of adequate cable television services." Suburban submits that nowhere does the Board adequately articulate the existence of either of those prerequisites in this case.
*70 Instead, the hearing examiner listed six regionalization factors that went into his decision: cost of service, quality of service, time of construction, community of interest, economic impact and overturning municipal consents. We find there is adequate evidence to support the hearing examiner's findings and conclusions as to the specifics of these factors.
Primarily, we agree that there are no significant differences between the companies in terms of cost of service, quality of service and time of construction, and that no "community of interest" was established by either Meadowlands or Suburban.
Rather, the critical question is whether the Board may properly use these factors in making a regionalization decision.
The limits of § 17(b) have not been defined by the courts. Here, the hearing examiner and the Board appear to have gone beyond the literal terms of the statute and have used the section to promote the policy of honoring as many municipal consents as possible. We cannot say that the Board erred in this expansive view of § 17(b). As pointed out by the Attorney General, the Board concluded that the development of cable television in the five municipalities where Meadowlands enjoyed municipal consents would probably be impeded for financial reasons unless it exercised its power under § 17(b) to include Kearny and East Newark.
Suburban next argues that the hearing examiner and the Board placed on it an unfair burden of justifying the overturning of seven municipal consents and ignored its valid municipal consent in Kearny. Suburban then argues that Kearny properly revoked the Meadowlands' consent and subsequently granted the consent to it. As such, Suburban asserts that it is in fact and in law the sole holder of a municipal consent for Kearny and it should be issued the certificate of approval for Kearny.
Suburban incorrectly reads the Board's order. The Board did not place on Suburban the burden of overturning seven municipal consents. Rather, the Board concluded that since it could issue a certificate of approval without a municipal consent pursuant to N.J.S.A. 48:5A-17(b), it did not have to decide *71 whether Kearny and East Newark had effectively revoked the Meadowlands' municipal consents.
The Board implies that it can issue certificates of approval at will, ignoring valid municipal consents pursuant to its regionalization power. We note that § 17(b) is limited by § 17(c). This section provides:
No such amended certificate shall be issued which would impair the terms of any existing certificate or of any municipal consent upon which such existing certificate is based, except with the consent of the holder of such existing certificate and of any municipality having issued such municipal consent.
In Clear Tel. Cable Corp. v. Public Utility Bd., 162 N.J. Super. 84 (App.Div. 1978), certif. granted 79 N.J. 472 (1978), we held that this provision does not apply only to municipal consents for which there are validly issued certificates of approval. Thus, had Kearny not subsequently consented to the Board's order, we may have found it necessary to decide if the Meadowlands' consent had been validly revoked. We do not, however, reach that question here.
The general rule is that the power to adopt an ordinance includes the power to amend or repeal an ordinance. Rutherford Bd. of Rec. Com'rs v. Rutherford, 166 N.J. Super. 476, 480 (App.Div. 1979); Isola v. Belmar, 34 N.J. Super. 544, 549 (App.Div. 1955). However, there are limits to this power where the municipality has granted a franchise right such as is involved in this case. Once a franchise right or privilege has been acquired from a municipality, that ordinance cannot be repealed, at least without due process of law. Rutherford Bd. of Rec. Com'rs, above 166 N.J. Super. at 480. Furthermore, after acceptance of the franchise, expenditure of money and probably also the beginning of construction, the franchise is irrevocable. Phillipsburg Electric Co. v. Phillipsburg, 66 N.J.L. 505 (Sup.Ct. 1901). These common law concepts are further complicated by the question of the Board's role in such a process. The OCTV has expressed the view that:
Once the ordinance granting the municipality's consent is issued, the regulation of the operator and enforcement of the terms of the franchise agreement be exclusively within the jurisdiction of the Office of Cable Television and the Board of Public Utilities. [A Guide to the Writing of the Cable Television Municipal Consent Ordinance, at 2]
*72 A contrary view would produce uncertainty in the two-tiered approval process. A municipality should not have the right to revoke a municipal consent once the applicant has filed a petition for a certificate of approval.
In its last point Suburban argues that it qualifies for a certificate of approval under the Board's "regionalization" criteria which it previously argued were invalid.
The hearing examiner primarily concluded that both companies could provide adequate service to Kearny and that there were no substantial differences between the two in terms of cost of service, quality of service or time of construction. His decision to award all seven communities to Meadowlands was based on other factors. The hearer's findings are supported by sufficient credible evidence on the record. In this highly technical area of factfinding we should defer to agency expertise.
The Board's decision to issue certificates of approval to Meadowlands for all seven municipalities is affirmed.