IN THE MATTER OF THE PETITION BY CONTROLLED CABLE
CORPORATION, CABLEVISION OF JERSEY CITY, SIX STAR
CABLEVISION, AND NEW JERSEY CABLE TV COMMUNICA-
TIONS SYSTEMS, INC., FOR A CERTIFICATE OF APPROVAL
TO CONSTRUCT AND OPERATE A CABLE TELEVISION SYS-
TEM IN JERSEY CITY, HUDSON COUNTY, NEW JERSEY.

Argued November 7, 1983—Decided March 13, 1984.

*David A. Waters* argued the cause for appellant Cablevision of
Jersey City (*Waters, McPherson, McNeill,* attorneys; *Mr.
Waters* and *Lawrence Z. Kotler,* on the brief).

*Barbara A. Harned,* Deputy Attorney General, argued the cause for appellant Board of Public Utilities (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Ronald D. Brown* argued the cause for respondent Controlled Cable Corporation.

*Robert H. Greenwood* argued the cause for respondent Suburban Cablevision (*Greenwood & Sayovitz,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the relationship between two provisions of the Cable Television Act, *N.J.S.A.* 48:5A–1 to –53 (Act). The specific question is whether a proposed cable television licensee may be denied a franchise by the Board of Public Utilities Commissioners (Board) without the hearing mandated by *N.J. S.A.* 48:5A–16b when the Board makes a preliminary determination that the municipal consents required by *N.J.S.A.* 48:5A–17a have not been obtained in compliance with applicable rules and regulations. We hold that the statutory hearing must be held unless there are no relevant issues in dispute, and affirm the Appellate Division judgment directing that a hearing be held in this case.

The case arises from a contested application for the Jersey City municipal cable television franchise. Seven cable television companies submitted applications for the franchise. The Municipal Council of Jersey City (City Council) conducted a series of hearings in which it considered the merits of each individual application. Ground rules for the conduct of the hearings were set down before commencement. Specifically, it was agreed that the applicants would present their own cases on the merits and refrain from disparaging competitors; that a schedule of submission dates would be established, including specific hearing dates for each of the individual applicants, two public hearings, and one decisional meeting; and that the deadline for submis-

sion of additional data would be five days after the last hearing date.

The last hearing was on October 8, 1980. On November 7, 1980, the City Council adopted a resolution awarding the franchise to Controlled Cable Corporation (Controlled). During Controlled's hearing before the City Council, its principals repeatedly stressed their intention to provide local management and ownership of a Jersey City cable television system. They would not be, in their words, "absentee owners," "carpetbaggers," or "conglomerate[s] * * * not really truly concerned in the local programming." They gave a "guarantee that there will be local management." At two points during the hearing Council members questioned the exact nature of Controlled's relationship with Suburban Cablevision (Suburban), another cable television company that was not an applicant for the Jersey City franchise. Controlled made it clear that Suburban was to be its principal financial and technical source. Controlled's principal said, however, that while it was "associating" itself with Suburban it remained the "prime mover in the corporation." In reaction to objections from two other applicants who charged that Suburban was a "back door" candidate, Controlled's principal stated: "It's very clear. Suburban Cablevision is not an applicant here." These comments were made on September 24, 1980.

Less than three weeks later, news accounts circulated in Jersey City that Controlled had agreed to sell 80% of its stock to Suburban. Suburban is one of the largest cable television operators in the State of New Jersey. It, in turn, is a subsidiary of Maclean-Hunter Cable TV, Ltd., a Canadian firm. On October 15, 1980, one of the other applicants sent a copy of the news article to the City Council, and emphasized that Controlled had not disclosed these arrangements. Another objector restated this argument to the City Council on February 10, 1981, when the City Council confirmed its resolution by the adoption of an ordinance, pursuant to *N.J.S.A.* 48:5A–24, awarding the franchise to Controlled.

On March 12, 1981, Controlled filed a petition with the Office of Cable Television in the Department of Public Utilities for a certificate of approval, as required for operation of a cable television system under *N.J.S.A.* 48:5A–16a. Contesting applicants petitioned for review, all alleging arbitrary refusal by the City Council, some alleging that they were entitled to the franchise because of regional considerations under *N.J.S.A.* 48:5A–17b, and others appealing to the exercise of the Board's paramount jurisdiction. The Board determined on June 22, 1981, that it would not conduct a hearing on Controlled's application, but permitted the parties to submit briefs and affidavits. Suburban then sought to intervene in the proceeding before the Board.

Without a hearing, the Board rendered its decision on September 28, 1981. It found that on November 14, 1980, Controlled had entered into an agreement to transfer 80% of its capital stock to Suburban, and found that the agreement was not before the City Council during its deliberation, in violation of the Act. It further found that a submission by Controlled on October 16, 1980, as well as those by two other applicants, were amendments to the applications filed after the previously determined deadline for amendments. On the basis of these irregularities, it denied the petition of Controlled for a certificate of approval and remanded the matter to the City Council for further hearings. At the same time, it denied the petitions of the other applicants and denied Suburban's motion to intervene.

On appeal, the Appellate Division reversed that order. That court held that the Board had improperly denied Controlled a hearing, and that all parties included in the proceedings before the Board, including Suburban, should be allowed to participate. The court agreed with Controlled that it should have had the chance to show that the City Council had before it the details of its relationship with Suburban; that any deficiency was not a violation of applicable regulations; and further that the October 16th, 1980, amendment merely corrected clerical mistakes and was not a source of error in the proceedings. The court also

held that the statute requires a hearing before the Board may deny an application for a certificate of approval after municipal consents have been obtained. Primarily because of an asserted conflict between this decision and *In re Micro-Cable Communications Corp.*, 176 *N.J.Super.* 197 (App.Div.1980), we granted certification. 94 *N.J.* 537 (1983).

In *Clear Television Cable Corp. v. Board of Public Util. Comm'rs.*, 85 *N.J.* 30 (1981), we reviewed in detail the history and purposes of the Act.

> The Act, discussed in more detail below, provides a framework for the issuance of CATV [cable television] franchises and the regulation of cable television service. The power over cable television, both in franchising and regulation, is divided between the Board and the municipalities. The Board sets certain minimum technical requirements for all cable companies in the State. The municipality then selects a cable television company and the type of service that conform at least to the minimum requirements. The Board has the ultimate power to grant or deny the right to operate where a municipality has given a company consent thereto. [*Id.* at 35.]

Under the statutory plan, cable companies must first obtain the municipal consents required by *N.J.S.A.* 48:5A–16a. Those consents must conform to "all requirements of this act and of rules, regulations and orders duly promulgated by the director [of the Office of Cable Television]." *N.J.S.A.* 48:5A–25. Companies then apply to the Board for a certificate of approval in order to operate, *N.J.S.A.* 48:5A–15, attaching to this application the municipal consents. *N.J.S.A.* 48:5A–16a. To insure compliance with the Act's terms, the Board is required to conduct a further review. Here the Board has authority to deny certification to an applicant, even where a municipality has granted consent, if the applicant does not meet the standards of public convenience and necessity, considering its suitability, character, and financial responsibility, and the applicant's ability to perform efficiently, considering regional needs, the proposed service and other services that may be required during the term of the municipal consent. *N.J.S.A.* 48:5A–16b. In a footnote, the *Clear* Court stated, however, that "the Board may not reverse the municipal consent without a hearing. Section 16(b)." 85 *N.J.* at 37 n. 3.

The Act provides that upon receipt of an application for certificate of approval,

> the board shall review the same and shall, within 30 days of the receipt thereof, either issue the certificate applied for or order the director to schedule a hearing upon the application. No application shall be denied without a hearing thereon. [*N.J.S.A.* 48:5A–16b.]

Controlled and Suburban emphasize the plain language of the statute that the Board either issue the certificate or schedule a hearing. They contend that the Board erred in reversing the municipal consent without the mandated hearing.

The Board contends, however, that the hearing provision of *N.J.S.A.* 48:5A–16b does not apply to the preliminary phases of Board determination under *N.J.S.A.* 48:5A–17a, which states:

> The board shall issue a certificate of approval when, after reviewing the application, and after hearing *if one is held,* the applicant establishes to its satisfaction that the applicant has all the municipal consents necessary to support the application, that such consents and the issuance thereof are in conformity with the requirements of this act, and that the applicant has complied or is ready, willing and able to comply with all applicable rules and regulations imposed by or pursuant to State or Federal law as preconditions for engaging in his proposed CATV operations; * * *. [Emphasis supplied.]

The Board relies on this language in *Micro-Cable:* "[B]efore the provisions of *N.J.S.A.* 48:5A–16(b) come into play, the provisions of *N.J.S.A.* 48:5A–17(a) must apply." 176 *N.J.Super.* at 203. Thus, it argues that the hearing provision of *N.J.S.A.* 48:5A–16b does not apply to the preliminary issues for Board determination under *N.J.S.A.* 48:5A–17a, specifically whether the issuance of the municipal consents was "in conformity with the requirements of this act."

We believe that the Board has overextended the reach of *Micro-Cable.* In that case, the applicant hand-delivered an unsolicited letter to the mayor and city council on the day before the final hearing, without notice to the other applicants. The Board found a clear and conceded violation of the ban on *ex parte* communications, set forth in *N.J.A.C.* 14:18–11.4. This provision is at the heart of the effort to preserve integrity in the licensing of the cable TV industry. The court emphasized that there was no issue of fact with respect to "[applicant's] violation

of the foregoing regulations * * *. A plenary hearing was unnecessary as there was no relevant issue in dispute." *Micro-Cable,* 176 *N.J.Super.* at 204 (citation omitted). It therefore affirmed the decision of the Board to deny the applicant's petition for a certificate of approval.

Here, the asserted failure to conform with the Board's rules and regulations is far less clear. The Board concluded that the late amendments of three applicants, including Controlled, and the failure to provide the City Council with the specifics of the November 14th, 1980, agreement between Controlled and Suburban during the City Council deliberations, violated the Act and regulations governing the application process, and as such "constitute[d] substantial errors in the municipal process." It therefore concluded that the municipal consent was invalid, since it was not issued in conformity with the prescribed procedure, and concluded that the hearing requirement of *N.J.S.A.* 48:5A–16b simply did not apply to the Board's action.

Initially, we fail to see how the late submission by other applicants can be set forth as a procedural irregularity that would prevent the Board from considering Controlled's application. As to Controlled's alleged late amendment, we agree with the Appellate Division that the issues are not as clear as the Board suggests. Controlled argues that the contents of the October 16, 1980, letter did not in any way constitute a material amendment of its application or submission. In its view, the letter constituted only a correction of clerical errors that were reasonably apparent on the face of the original submission. *Compare In the Matter of Contract for Route 280,* 179 *N.J.Super.* 280 (App.Div.1981), app. dism., 89 *N.J.* 1 (1982) (under public bidding law, agency can waive immaterial bidding deviation).

The specific points in the letter were, first, that the location of various channels and sources had been transposed due to clerical errors in the application. For example, where the application would show the nature of the channel, such as Home Box Office or Cinemax, the typist had inserted the satellite source, suggest-

ing that the pay-TV channels were part of the basic service. Controlled argues that it is patently clear to anyone familiar with the industry that these supplementary services are never part of the basic service.

The second point covered in the letter was that Controlled would elect to provide a special converter system rather than the guidance key to lock out programs that parents might find objectionable. Both systems had been mentioned as possible alternatives in its timely submission.

Finally, the letter is asserted to include changes in certain installation charges that the applicant denies making.

We are satisfied that there are relevant issues in dispute as to whether the letter of October 16, 1980, constituted a material amendment to the original submission, and a hearing is necessary to explore its significance.

The issue of the Controlled-Suburban agreement is indeed more troubling. A central theme of the Cable Television Act is the elimination of favoritism and corruption. *N.J.S.A.* 48:5A–2 c(3); State of New Jersey CATV Comm'n, Report to the Governor and Legislature (Pursuant to Assembly Concurrent Resolution No. 2041 of 1971) 35–36 (1972). To that end full disclosure at all phases of the process is essential. Yet, neither the statute nor the regulations provide a roadmap that guides an applicant unerringly to the correct form of submission. The Act provides that:

> In addition to whatever other information may be required by the director under duly promulgated rules and regulations to be contained in any application for a municipal consent, each such application shall contain:
>
>    *    *    *    *    *    *    *    *
>
> (c) Sufficient evidence that the applicant company has the financial and technical capacity and the legal, character and other qualifications to construct, maintain and operate the necessary installations, lines and equipment and to provide the service proposed in a safe, adequate and proper manner. [*N.J.S.A.* 48:5A–28c.]

The regulations governing the Act offer general guidelines for applicants' submissions:

(a) Every application for a new consent shall be submitted on a standard form supplied by the office, which form shall include but not be limited to the following information:

1. Organization and management:
   i. Type of business organization;
   ii. System name, address and telephone number;
   iii. Stockholders, directors, owners;
   iv. Personnel, including system manager, accountant, attorney, chief engineer and registered agent;

2. Legal:
   i. Individuals or organizations other than those lis[t]ed in paragraph 1 above with financial interests in the applicant * * *. [*N.J.A.C.* 14:18–11.20(a).]

As to financing in particular, *N.J.A.C.* 14:18–11.20(a)(8) does not require the disclosure of any specific percentages of stock ownership. It requires that an applicant inform the municipality of the source of funds to be provided for the construction of the proposed system. *N.J.A.C.* 14:18–11.20(a)(8)(iii). It does not suggest clearly that the failure to inform the City Council of the precise agreement resulted in a lack of information regarding Controlled's financial capacity and the source of its funds.

The structure of the Act and present regulations also suggests a qualified municipal role in evaluating financial capacity. *N.J. S.A.* 48:5A–27 specifically authorizes the Board to conduct a preliminary inquiry, at municipal request, into the financial capacity of the applicants. *N.J.S.A.* 48:5A–43 provides that a cable television company of this State cannot transfer any shares of its capital stock to any other cable television corporation, unless authorized to do so by the Board; nor can a New Jersey cable television company sell or transfer a majority of its capital stock to any person, unless authorized to do so by the Board. *N.J.A.C.* 14:18–11.17(a)(6) prohibits any municipal ordinance requirements within the responsibility of the Office of Cable Television, referring specifically to "[t]ransfers of * * * stock." The Board may conclude that in the discharge of its supervisory responsibilities the proposed financing and stock

transfer arrangements are not in the best interests of the public convenience and necessity and disapprove them.

The agency's signals with respect to financial capacity have been mixed. In a pre-regulation case, the Board permitted an applicant with an admitted lack of financial capacity to amend its application before the Board to include information about new financing sources, and in lieu of remanding the matter to the municipalities, granted the license itself. *In re Meadowlands Communications Systems, Inc.,* 175 *N.J.Super.* 53 (App. Div.), certif. den., 85 *N.J.* 455 (1980). The same procedure was followed in another case, where the applicant's alliance with a new financial source would result in quicker and more economical construction of the cable system. *In the Matter of Certificate of Approval for Lawrence Township,* (Bd. of Publ. Util., Docket No. 8011C–6731, July 23, 1981).

Indeed, throughout the hearings Jersey City's attorney referred to his communications with the Office of Cable Television, which aided him in advising the City Council correctly. He said: "In fact, there was almost a daily contact between me and the Office of Cable Television as to what transpired, what will transpire, what would transpire during the form they used, so that, if there was any objection on the part of the Office of Cable Television I would immediately change the procedure." Apparently he received no objection as to the procedure he followed. In light of this background, we cannot conclude that on the face of the pleadings and exhibits before us no issues remain in dispute as to whether there has been a clear noncompliance with disclosure requirements by Controlled at the time the proceedings were conducted before the City Council.

The Board concluded that Controlled did not inform the City Council that its financing agreement with Suburban would result in an 80% takeover of the company, and that Controlled never presented all of the essential facts of the agreement to the City Council. It maintains that the fact that a competitor

applicant notified the City Council of a newspaper report of the proposed takeover did not relieve Controlled of its obligation to so inform the City Council; and that Controlled was obviously aware of the specifics of the impending agreement, in that one of its principals supplied information for the October 14th news report. Thus, in the Board's view, the news account demonstrated that the applicant concealed information but it did not demonstrate that the municipality possessed the information.

Concededly, Controlled's submission did not specify the percentage of local ownership when it described the ownership of its principals as "subject to dilution." But the percentage may not have been fully resolved by October 14, the last day that the applicant could make a substantive amendment. On October 14, Controlled specifically referred to its relationship with Suburban and included information about Maclean-Hunter, Ltd. as well. Even the evidence of the acquisition agreement, dated November 14, 1980, fails to establish with any precision the eventual financial arrangements between the parties. For example, the agreement submitted had deleted the purchase price and contained no closing date. Yet, in the Board's view the October 14th amendment stating that Suburban would provide the "debt and equity financing" failed to inform the City Council of the true nature of its agreement in obtaining this financing. However, the focus of the municipal hearings was not upon the economic capacities of the parties. The focus was on the nature and quality of the cable service to be provided and the identification of the company with the Jersey City community. Controlled was the only company that had local participation.

In this posture of the proofs, we would not conclude that the municipal consents must of necessity be invalidated. The Board suggests that this confuses the legal question of whether the information supplied by Controlled satisfied the Act's requirements with the factual questions, which in its estimation were undisputed. We think not. The Appellate Division correctly

concluded that the matters involved both fact and law and required a hearing for their resolution. The right to be heard is rooted in our concepts of procedural fairness and its statutory mandate here should be followed. *See Asbury Park v. Department of Civil Service,* 17 *N.J.* 419 (1955); *Handlon v. Belleville,* 4 *N.J.* 99 (1950). We need not decide the exact format of the hearing. We have recognized agency discretion to tailor the hearing to the issues. *See Cunningham v. Department of Civil Service,* 69 *N.J.* 13 (1975) (Civil Service Commission could limit plenary hearing to genuine issues by receiving preliminary offer of proof buttressed by affidavits). If an evidentiary hearing is required, it appears appropriate to follow the guidelines of the Administrative Procedure Act in contested cases, to permit the parties to present evidence and argument on the issues involved. *N.J.S.A.* 52:14B–9. A fuller record will enable the Board to reach a determination whether these percentages were fixed on October 14, 1980, and whether the percentages were indeed material to the local agency's consideration.

We express no opinion on how the policies of the Act are to be best fulfilled. The Board has emphasized that the parties should not supplement their submissions after an agreed-upon procedural cutoff. Yet it has suggested in this case that an applicant may have erred in not submitting emerging information concerning the extent of the dilution of stock ownership. It may be that for the future the Board will adopt a rule to require that supplementary information of any proposed change in corporate structure be furnished to the licensing agency at all phases of the procedure before the adoption of municipal consents. In this case, however, we believe that the Board should consider the materiality of this new information in the context of the interests expressed at the hearings. Because of its social, economic, and cultural diversity, Jersey City has special concerns. It explored various factors at the hearings: how the installation work would be done; whether because of its many senior

citizens, one-time access to the improved cable signal without monthly cost was guaranteed; whether local channels would be available for community service programming; and whether the licensee would have local participation or control. These were the express concerns of the City Council. The Board will have to weigh these factors in making its final determination in the public interest as to the materiality of the omissions and changes.

It is important to mention that the applicant has acquired no vested rights in the franchise, and the Board is not restricted merely to restructuring the financial arrangements of the applicant. The Board may conclude that nondisclosure of an 80% shift in stock ownership is so substantial, particularly in light of the signing of an agreement within one week of the adoption of the resolution, that the Board might well disapprove the municipal franchise. This is particularly so because the applicant emphasized its local identity at the hearing and it now appears that stock control of the franchise will, in effect, be held by a Canadian firm. Of course, the adequacy of the findings of the administrative agency will depend on the evidence adduced at the hearing. In the absence of other evidence, the present record may support a Board decision on the merits.

A final word is appropriate. The Board is concerned that in deciding whether there has been compliance with *N.J.S.A.* 48:5A–17b, it must conduct a plenary hearing on the substantive merits of the application. Such a process would also require an evaluation of the contesting applications. We are certain that the legislative scheme does not prohibit the agency from performing its functions in an orderly way. We have repeatedly emphasized that agencies have inherent power to adapt their procedures to achieve their statutory goals. *Crema v. New Jersey Dept. of Environmental Protection,* 94 *N.J.* 286, 299 (1983); *In re Kallen,* 92 *N.J.* 14, 25 (1983); *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 338 (1982)

(Handler, J., concurring), app. dism., 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981); *Hinfey v. Matawan Regional Bd. of Educ.*, 77 *N.J.* 514, 530 (1978); *Laba v. Newark Bd. of Educ.*, 23 *N.J.* 364, 383 (1957). The Board may bifurcate its proceedings and conduct a hearing considering only that evidence relative to the issues of (1) whether the letter of October 16, 1980, constituted a material amendment to the applicant's submission, in violation of the ground rules established by the parties, or whether it was merely a technical correction; and (2) whether the failure to furnish information as to a fixed stock takeover agreement prior to Controlled's last submission constituted a violation of the Act or regulations that was material to the City Council's deliberations. It may also consider, if it elects, whether to approve the stock transfer arrangements.

One of the objects of the Cable Television Act and regulations promulgated thereunder is to eliminate "even the appearance of impropriety in the award of CATV franchises at the municipal level." *Micro-Cable*, 176 *N.J.Super.* at 206. An application should be more than a corporate shell game. In an industry where the Legislature has acted to eliminate favoritism and corruption, a lack of candor will undermine public confidence in the process. As stated in *Micro-Cable*, "[t]he very nature of the business requires strict compliance with the regulations." *Id.* The Appellate Division judgment insists upon equally strict compliance with the Act's requirement that there be a hearing by the Board before a decision to deny, under *N.J.S.A.* 48:5A–16 b.

The judgment of the Appellate Division is affirmed.

*For affirmance* —Chief Justice WILENTZ and Justices CLIF-FORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For reversal* —None.