154 N.J. Super. 126 (1977)
381 A.2d 34
THE NORTH JERSEY SUBURBANITE CO., INC., PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY, DEFENDANT-RESPONDENT,
v.
NEW JERSEY PRESS ASSOCIATION, DEFENDANT-INTERVENOR AND RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 26, 1977.
Decided October 31, 1977.
*128 Before Judges CONFORD, MICHELS, and PRESSLER.
Mr. Laurence B. Orloff argued the cause for appellant (Messrs. Orloff, Lowenbach, Stifelman & Siegel, attorneys).
Mr. Lawrence Weintraub argued the cause for defendant-intervenor and respondent (Messrs. Seiffert, Frisch, Gruber *129 & Cafferty, attorneys; Mr. Thomas J. Cafferty of counsel and on the brief).
Mr. William F. Hyland, Attorney General of New Jersey, attorney for defendant-respondent, filed a statement in lieu of brief (Ms. Erminie L. Conley, Deputy Attorney General, of counsel; Mr. John F. Shoosmith, Jr., Deputy Attorney General, on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
Plaintiff North Jersey Suburbanite Co., Inc., the publisher of a periodical in tabloid form distributed weekly and free of charge in 14 Bergen County municipalities, appeals from a declaratory judgment adjudicating the constitutionality of N.J.S.A. 35:1-2.1 and 2.2, which prescribe, respectively, the qualifications of newspapers eligible to publish the statutorily mandated public notices of State Government and of local governmental units. For the reasons herein set forth, we are persuaded that plaintiff has failed to bear its formidable burden of overcoming the presumption of constitutionality attaching to legislation which, as here, is facially reasonable. Accordingly, we affirm.
Plaintiff's constitutional challenge focuses upon three of the eligibility requirements which are common to both statutes, namely, that the newspaper have a general paid circulation, that it have "an average news content of not less than 35%" and that it shall "have been entered for 2 years as second-class mail matter under the postal laws and regulations of the United States." Among the federal postal regulations so incorporated are the disqualification of publications whose advertising content exceeds 75% and whose circulation is either free or at nominal rates. 39 U.S.C.A. §§ 4352(c), 4354(c). Plaintiff's primary argument on appeal is that, contrary to the findings below, its proofs at trial indisputably demonstrated that these criteria, neither singly nor cumulatively, are reasonably related to the advancement *130 of any legitimate statutory objective sought to be achieved thereby and hence that an eligibility classification based thereon contravenes the equal protection clause of the fourteenth amendment. Subsidiarily, it argues, first, that the content of the stated criteria is violative of due process by virtue of the vagueness of specified terminology, and second, that the second-class mailing permit requirement constitutes an impermissible delegation of legislative authority.
In considering the equal protection argument relied on by plaintiff we are first satisfied that the appropriate standard of review of this legislation is the traditional test of whether the statutory classification is rationally related to the promotion of a valid legislative purpose. We reject the contention that we should here apply the stricter test of whether the statute promotes a compelling state interest. It is our understanding of federal constitutional doctrine that the compelling state interest test is mandated only when the challenged legislation either interferes with a fundamental constitutional right or is based upon an inherently suspect classification. San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16 (1973). And see, State v. Fearick, 69 N.J. 32, 39-40 (1976); State v. Krol, 68 N.J. 236, 253 (1975). Neither of these special circumstances inheres in these statutes. While plaintiff argues that the First Amendment right of freedom of press is here involved, it has failed to suggest, nor do we perceive, precisely how that right is implicated by the statutory criteria here challenged. There is no proof that the inability of plaintiff and others similarly situated to obtain legal advertising in any way measurably affects their freedom of expression or capacity to disseminate news. We have, moreover, little doubt that the constitutionally protected freedom of the press is not impaired by reasonable state restrictions imposed on paid advertising content, whether commercial or governmental, which are designed to advance other legitimate public policy concerns. Cf. Passaic Daily News v. Blair, 63 N.J. 474 (1973).
*131 Application of the reasonable relation test persuades us that the virtually self-evident nexus between the challenged criteria and the advancement of a valid legislative purpose has survived the barrage of plaintiff's proofs. The legislative purpose is apparent not only from the face of the statutes themselves but is further implicit in the statements appended thereto when they were first adopted. It was the Legislature's obvious intention that published official notices come to the attention of as wide and diverse a readership as possible. See Plainfield v. Courier News, 72 N.J. 171, 177 (1976). And it was also the Legislature's evident assumption that that purpose would be most reliably accomplished by requiring such notices to be published in "actual" and "bona fide" newspapers as distinguished from a "mere advertising medium" or "advertising circulars".[1] The basis of that assumption, which we regard as valid as a matter of both common sense and common experience, was clearly its belief that the contents of a newspaper paid for by its readers and having all the characteristics of a genuine journalistic product would reach and have the attention of more people, representing a broader cross-section of the population, than would the contents of a free publication designed and distributed primarily for commercial advertising purposes. Finally the Legislature, *132 in order to distinguish between what it regarded as a bona fide newspaper and an advertising medium, quite reasonably did so on the basis of a news content ratio, concluding that a periodical whose news was at least 35% of its total content would clearly be identified by the public as a legitimate journalistic vehicle. Since a news content ratio is a prima facie reasonable technique for determining whether the essential character of a periodical is that of an actual newspaper, we cannot say that the fixing of a 35% ratio for that purpose is prima facie unreasonable.
Plaintiff does not argue with the validity of the legislature purpose. Its theory, rather, is that the aim of insuring wide and diverse readership of legal notices is in fact not promoted by the legislative selection of criteria which exclude the hybrid type of periodical published by it and others similarly situated. We agree, however, with the trial judge that that theory was inadequately supported by plaintiff's proof.
The proofs demonstrated that plaintiff's publication is a member of a discernible class of periodicals which is a phenomenon of suburban life in generally affluent counties.[2] Customarily known as "shoppers," the general characteristics shared by these periodicals are their primary advertising purpose; their free weekly distribution, typically by delivery and on a "saturation" basis, to the residences and some of the businesses in the areas they serve; a nonadvertising content frequently as high as 20% of total lineage and primarily devoted to civic, cultural and social matters of local interest, and the employment of full-time staffs. These periodicals, or at least those identified at the trial, typically are distributed in communities which are also served by weekly paid newspapers. The thrust of the proofs was directed to a comparison of both the circulation and the *133 quantity of nonadvertising lineage as between the free circulation paper and the paid weekly serving the same community. Invariably the free-circulation paper was delivered to a significantly greater number of households than the paid paper and frequently, because of its greater number of pages, its total nonadvertising lineage was greater.
The essential flaw, however, in this massive presentation of statistical proof was the plaintiff's inability to demonstrate to the trial judge's satisfaction that the wide circulation of its paper resulted in its wide and diverse readership. We concur in the trial judge's findings that the results of a survey testified to by a plaintiff's witness in support of an alleged delivery-readership equation did not reliably establish that proposition because neither the methodology of the survey, the sampling on which it was based, nor its underlying predicates comported with accepted standards of reliable survey techniques.
This flaw in plaintiff's proof is obviously fatal to its contention. Its publication and others like it, despite the quantity of their nonadvertising content, still, because of their relatively low ratio of nonadvertising copy and their free circulation, retain the essential character of advertising media and are so identified by the public. The breadth of their circulation has no necessary correlation to the extent of their readership. Plaintiff has thus failed to prove that massive unsolicited and unpaid-for home delivery of this type of publication results, contrary to reasonable expectations of behavioral pattern, in their being read by either a wide or by a diverse cross-section of the community. Thus the classification here challenged has not been demonstrated to be arbitrary, capricious or unrelated to the specific objective of the legislation. The presumption of constitutionality has accordingly not been overcome. See N.J. Restaurant Ass'n v. Holderman, 24 N.J. 295, 300 (1957); Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 218-219 (1960).
*134 We find no merit in plaintiff's remaining arguments. It contends that the statutes are void for vagueness because of the indefiniteness of the meaning of the phrase "average news content" used in specifying the minimum acceptable ratio. While we agree that the phrase is regrettably inartful in its failure to indicate the period to be averaged,[3] we are satisfied that plaintiff's own proofs supported the trial judge's conclusion that annual averaging was the obvious intent of the Legislature and that that intent was uniformly so understood by the trade. We regard as not constitutionally defective, in due process terms, the remaining ambiguity, namely, whether or not the annual period for purposes of these statutes is the 12 months immediately preceding the acceptance of public notices for publication or the 12-month period referred to by N.J.S.A. 35:2-1, commencing on October 1 of each year, which is the period therein required to be the subject of the circulation affidavit on the basis of which advertising rates are calculated. We regard that ambiguity of little moment since it is clear that in the unlikely event that resolution of that question was to be dispositive as a matter of fact of a newspaper's right to publish public notices, the statutes would be interpreted in accordance with their less restrictive alternative meaning since such an interpretation would clearly meet the purpose of that criterion. See, e.g., Reiser v. Passaic Cty. Pension Comm'n, 147 N.J. Super. 168, 176 (Law Div. 1976).
Finally, plaintiff asserts that incorporation in these statutes of the substantive requirements of the federal second-class mailing statute, not only as they presently exist but as they may be from time to time amended, constitutes an impermissible delegation of the legislative function. It relies in this assertion on Dearborn Independent, Inc. v. City of Dearborn, 331 Mich. 447, 49 N.W.2d *135 370 (Sup. Ct. 1951), so holding in respect of a similar incorporating provision of the Michigan statute governing publication of legal notices. We regard that decision as, however, contrary in principle to the pronouncement of our Supreme Court, which in State v. Hotel Bar Foods, 18 N.J. 115 (1955), expressly approved incorporation of prospective federal regulation for the purpose, as here, of achieving desirable uniformity.
Affirmed.
NOTES
[1] N.J.S.A. 35:1-2.1 originally enacted as L. 1935, c. 177, § 1, was accompanied by this statement:

The object of this act is to limit the selection of newspapers for official advertising to actual newspapers printed and published in the State and qualified and eligible to use the second class newspaper mailing privileges in the United States. This is to prevent the selection of any mere advertising medium or circular or pretended newspaper publication.
N.J.S.A. 35:1-2.2, originally enacted as L. 1936, c. 208, § 1, was accompanied by this statement:
The object of this act is to confine legal advertising as far as possible to newspapers as distinguished from advertising circulars or papers that are published simply for the purpose of advertising and which do not have a bona fide newspaper circulation. The provisions * * * are identical to requirement of Chapter 177, P.L. 1935 * * *
[2] All of the members of the class identified at trial were circulated in suburban communities in the areas of Bergen, Union, Morris and Middlesex Counties.
[3] Compare the precise provision of 39 U.S.C.A. § 4352 requiring, for second-class mailing privileges, no more than 75% advertising "in more than one-half of its issues during any twelve-month period."