EVERS, J. T. C.
The. issue presented on cross-motions for summary judgment involves the constitutionality of the New Jersey Spill Compensation And Control (spill fund) Act, N.J.S.A. 58:10-23.11 et seq. Its resolution requires a determination of whether that statute has been preempted by § 114(c)[1] of the Comprehensive Environmental Response, Compensation and Liability (super fund) *299 Act of 1980, P. L. 96-510, 94 Stat. 2767, codified as 42 U.S.C.A. § 9601 et seq., in which event it must fall, as mandated by the Supremacy Clause of the United States Constitution.[2] For the reasons hereafter set forth plaintiffs’ motion is denied and defendants’ motion is granted.[3]
Plaintiffs also seek a return of all monies paid to New Jersey pursuant to the spill fund since December 11, 1980, the effective date of super fund.[4] Purely legal questions are presented which *300 make the action appropriate for summary judgment. Tyson v. Groze, 172 N.J.Super. 314, 319, 411 A.2d 1170 (App.Div.1980); Felbrant v. Able, 80 N.J.Super. 587, 590, 194 A.2d 491 (App.Div. 1963). See, also, Judson v. Peoples Bank and Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954); R. 8:7(a); R. 4:46-1; R. 4:46-2.
Section 114(c) of super fund states:
Except as provided in this Act, no person may be required to contribute to any fund, the purpose of which is to pay compensation for claims for any costs of response or damages or claims which may be compensated under this title. Nothing in this section shall preclude any State from using general revenues for such a fund, or from imposing a tax or fee upon any persons or upon any substance in order to finance the purchase or prepositioning of hazardous substance response equipment or other preparations for the response to a release of hazardous substances which affects such State.
Plaintiffs, five major corporations whose operations involve the use of recognized hazardous substances, including petroleum, are taxed under both acts. On the basis*that both acts have as their principal purposes the payment of claims and costs relating to the cleanup, removal and containment of hazardous substance spills, plaintiffs interpret this provision as precluding New Jersey from collecting any tax that is earmarked for such purposes. Plaintiffs seemingly argue that New Jersey can only gain the use of industry tax monies for cleanup purposes by requesting and obtaining Federal Government participation in a specific project. In the event Federal Government participation is withheld, only general revenues are available for state action, according to plaintiffs. Any areas which may be compensated under spill fund but which may not be compensated under super fund are peripheral, according to plaintiffs, and are so insignificant as to be unable to sustain the state tax. Accordingly, plaintiffs contend that the entire state act must be nullified.
Defendants deny that the spill fund tax is preempted unless there is a precise coincidence of tax money expenditures. In its more narrow interpretation the State contends that only those spill fund tax monies which are used for identical purposes and which are actually covered by super fund expenditures can be preempted. Furthermore, defendants contend that the statuto *301 ry scheme designed by Congress in super fund emphasizes the need for a combined federal and state response to toxic contamination. Super fund, according to defendants, provides a framework for a cooperative federalism in which the Federal Government would work with the states to effectuate the broad statutory goals of protecting the citizens and the environment of the country from the deleterious effects of pollution cause by hazardous substances. In short, it is defendants’ position that not only can super fund and spill fund, as presently constituted, co-exist but that they are intended to co-exist. Alternatively, the State argues that, if preemption does exist, it is not total and the taxes collected as to the non-preempted areas are permissible. In order to place these contentions in proper perspective a review of the purposes and pertinent provisions of both statutes is necessary.
Spill fund, which became effective in 1977, in its general terms prohibits the discharge of petroleum and other hazardous substances in the State of New Jersey. Pertinent to this controversy are its specific provisions which provide for the removal and cleanup of such discharges, N.J.S.A. 58:10-23.11f, the establishment of a spill compensation fund, N.J.S.A. 58:10-23.11Í, and the raising of revenue therefor pursuant to N.J.S.A. 58:10-23.11h, which states: “There is hereby levied upon each owner or operator of one or more major facilities a tax to insure compensation for cleanup costs and damages associated with any discharge of hazardous substances to be paid by the transferee . ...”[5] The administrator of the fund is directed, pursuant to N.J.S.A. 58:10-23.11o, to disburse monies from the fund for the following purposes:
1. All costs incurred by the State in connection with the removal and cleanup of hazardous substance discharges.
2. All direct and indirect damages no matter by whom sustained, including but not limited to:
*302 a. The cost of restoring, repairing or replacing any real or personal property damaged or destroyed by a discharge; any income lost as a result of damage to' or destruction of such property; any reduction in value of such property as a result thereof.
b. The cost of restoration and replacement of damaged or destroyed natural resources.
c. Loss of income or impairment of earning capacity due to damage to real or personal property.
d. Loss of tax revenues by the state or local governments resulting from damage to such property for a period of one year.
e. Interest on loans obtained or other obligations incurred by a claimant for the purpose of ameliorating the effects of a discharge pending payment of the claim.
N.J.S.A. 58:10-23.11o also provides for the disbursement of sums, as may be appropriated by the Legislature, for research on the prevention and effects of spills, for the development of improved cleanup and removal operations, for demonstration programs and for administration, personnel and equipment costs.[6]
During the latter 1970s the Congress undertook the task of developing a program to deal with national hazardous waste problems. At one point in its deliberations Congress debated establishing a fund of $4.1 billion for that purpose. On December 11, 1980 these federal legislative efforts culminated in the enactment of super fund which provides $1.6 billion over a five-year period for the cleanup and removal of pollution caused by the release of hazardous substances into the environment. To finance this program Congress levied a tax against the chemical and petroleum industries designed to provide 87.5% of the funds needed to support the federally-approved cleanup *303 efforts. The remaining 12.5% is supplied through general federal revenues. §§ 111, 112, 201, 211 and 221.
Section 104 of super fund provides generally that whenever there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to remove or arrange for the removal of, and to provide for remedial action relating to such hazardous substance, pollutant or contaminant. Section 211 provides for the amendment of chapter 38 of the Internal Revenue Code to impose a tax on crude oil and petroleum products and on certain chemicals. This amendment became effective April 1, 1981. Pursuant to § 111 of super fund the President is authorized to use the money in the fund for, among other things, payment of costs of government response to hazardous waste discharges and costs incurred in compensating certain losses resulting from such discharges.
Recognizing that some states had already occupied the field and, in an implicit acknowledgement that such state involvement was necessary to assure more complete responsive action to hazardous waste spills, Congress provided in § 104(c)(2) that the Federal Government must consult with an affected state before determining appropriate remedial action. And, in § 104(c)(3), Congress mandated a minimum level of state participation as a prerequisite to receiving federal funds. To qualify for federal cleanup dollars states must formally guarantee, by contract or cooperative agreement, to provide (1) all future maintenance of removal and remedial actions; (2) the availability of a hazardous waste disposal facility for the off-site storage or treatment of hazardous substances, and (3) payment of 10% or more of the total cost of remedial operations. The state share of cleanup expenses can escalate to 50% or more if the site of the release is owned by the state itself or a political subdivision thereof. Id. Moreover, § 104(d)(1) encourages states to become official response authorities when they can demonstrate that they have the technical capability necessary to effect the purposes of the act. Under this section states undertake the *304 initiation and upfront financing of remedial work and then apply to super fund for reimbursement of “reasonable response costs.” Id. See, also, § 105 (directs the Federal Government to adopt a National Contingency Plan setting forth federal and state responsibilities under super fund and establishing criteria for determining priorities [with state input] among hazardous substance releases throughout the United States); § 111(f) (Federal Government permitted to delegate authority to state officials to obligate super fund monies where a state has replaced the Federal Government as a response authority); § 112 (Federal Government authorized to use state agencies to implement super fund claims procedure), and § 114(a) (states permitted to impose any liability in addition to that contained in super fund with respect to the release of hazardous substances within its borders).
It is fundamental that where a state statute conflicts with a federal statute which has preempted the field and stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, the Supremacy Clause of the United States Constitution mandates that the state statute must fail. Maryland v. Louisiana, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); Chicago and North Western Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981); Arizona v. Snead, 441 U.S. 141, 146, 99 S.Ct. 1629, 1632, 60 L.Ed.2d 106, 111 (1979); Mobil Oil Corp. v. Tully, 653 F. 2d 497 (Emerg.Ct.App.1981); Tennessee v. Louisville & N. R. Co., 478 F.Supp. 199, 209 (M.D.Tenn.1979); National Carriers’ Conf. Comm. v. Heffernan, 454 F.Supp. 914, 915 (D.Conn.1978). Where Congress has not foreclosed the field, a state statute is nevertheless void to the extent of actual conflict with a federal statute. Ray v. Atlantic Richfield Co., 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179, 188-189 (1978).
The court is mindful, however, that legislative enactments are presumed to be valid, and the burden on plaintiffs of demonstrating unconstitutionality is a heavy one. Velmohos v. Maren Engineering Corp., 83 N.J. 282, 295, 416 A.2d 372 (1980); *305 North Jersey Suburbanite Co., Inc. v. State, 154 N.J.Super. 126, 129, 381 A.2d 34 (App.Div.1977); English v. Newark Housing Auth., 138 N.J.Super. 425, 431, 351 A.2d 368 (App.Div.1976). Furthermore, the court is conscious of its duty to construe a statute to render it constitutional If the enactment is reasonably susceptible to such interpretation, even though the statute may also be open to a construction which would render it unconstitutional or permit its unconstitutional application. State v. Profaci, 56 N.J. 346, 349, 266 A.2d 579 (1970); State v. Negron, 118 N.J.Super. 320, 323, 287 A.2d 461 (App.Div.1972). See, also, N.J. Chamber of Commerce v. N.J. Election Law Enforce. Comm’n, 82 N.J. 57, 75, 411 A.2d 168 (1980). Additionally, with reference to preemption, the court recognizes that it must attempt to harmonize state and federal laws whenever possible, particularly in areas traditionally reserved to the states and which relate to the vital interests of state citizens. Florida Lime and Avocado Growers v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); Huron Cement Co. v. Detroit, 362 U.S. 440, 443, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960); Swift & Co. v. Wickham, 364 F. 2d 241 (2 Cir. 1966), cert. den., 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967); Katharine Gibbs Sch. Inc. v. F. T. C., 612 F. 2d 658, 667 (2 Cir. 1979). Thus, the state act should not be set aside unless the court finds that § 114(c) permits no other conclusion; that the Congress has unmistakably ordained that super fund be the sole recipient of industry tax dollars where the purposes of the two acts are identical.
The specific subject of inquiry is that portion of § 114(c) which states:
.. . [N]o person may be required to contribute to any fund, the purpose of which is to pay compensation for claims for any costs of response or damages or claims which may be compensated under this title.
The pivotal language is “may be compensated” and particularly the word “may.” Plaintiffs contend that the phrase is clear and unambiguous and that under the “plain meaning” rule of statutory construction “may” must be employed in its usual literal permissive sense. Accordingly, plaintiffs argue that the sole function of a court is to interpret the statute according to its *306 terms without the aid of extrinsic evidence. The State maintains that § 114(c) is unclear in certain respects, particularly when viewed in the light of the spirit of federal-state cooperation as evidenced by the language of super fund itself, and the impact that a strict and literal interpretation (as contended for by plaintiffs) would have on spill fund which contains far broader substantive coverage and liability provisions than does super fund. In short, the State argues that Congress intended that “may” should be interpreted in a mandatory sense — an interpretation that, in effect, would substitute “shall be compensated” or “shall have been compensated” for “may be compensated.” To ascertain that Congressional intent, the State claims that resort must be had to extrinsic aids.
Plaintiffs further argue that the State’s interpretation would violate a second fundamental rule of construction which requires that, if possible, effect must be given to every word, clause or sentence of a statute; that a statute must be construed so that no part is made inoperative, redundant or superfluous. Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596, 607 (1979); U.S. v. Palmeri, 630 F.2d 192, 199 (3 Cir. 1980); Abbotts Dairies v. Armstrong, 14 N.J. 319, 327, 102 A.2d 372 (1954); Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 68, 389 A.2d 465 (1978); 2A Sutherland, Statutory Construction (3 ed. 1973), § 46.06. The State’s interpretation, according to plaintiffs, amounts to a prohibition against double compensation and thus would be redundant of § 114(b) which states:
Any person who receives compensation for removal costs or damages or claims pursuant to this Act shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law. Any person who receives compensation for removal costs or damages or claims' pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this Act.
Next, taxpayers claim that such interpretation would nullify the Congressional intent found in the latter portion of § 114(c) which provides that the clause does not preclude a state from using general revenue for duplicate spending or from using taxpayers’ contributions for the additional purposes set forth *307 therein. If the State could continue to collect an industry tax for any and all purposes, with the only limitation being payments on claims paid by super fund, plaintiffs assert that the provision concerning the use of general revenue would be purposeless. The court disagrees with the foregoing and finds that, when read and understood in proper context, the State’s interpretation does not render the questioned provisions of super fund inconsistent, redundant, superfluous or meaningless.
The court finds that the pertinent language of § 114(c), does not, by itself, convey that clear, unambiguous meaning attributed to it by plaintiffs — a conclusion that is highlighted when it is read in conjunction with the balance of the super fund act. The seemingly simple, but often misused and misapplied word “may,” is anything but unambiguous. The word “may” is often subject to differing meanings when used in statutory construction. Supporting the dual function of the word are the comments of the court in Kraft v. Board of Ed. for Dist. of Columbia, 247 F.Supp. 21, 24-25 (D.C.D.C.1965), cert. den., 386 U.S. 958, 87 S.Ct. 1026, 18 L.Ed.2d 106 (1967), where it was stated:
It is well established, however, that the word “may” can be at times construed to mean “shall”, just as the word “shall” may be construed to mean “may”. The interpretation of those words depends upon the context in which they are used and the intention of the legislative body as is shown by the statute as may be gleaned from committee reports and similar authoritative sources. [247 F.Supp. at 24-25]
Accord, Bell v. Western Employer’s Ins. Co., 173 N.J.Super. 60, 65, 413 A.2d 363 (App.Div.1980); MacNeil v. Klein, 141 N.J.Super. 394, 358 A.2d 488 (App.Div.1976). In light of the ambiguity of the meaning of “may,” and in view of the contradictory interpretations which have been voiced as to the interpretation of § 114(c) by both parties, it is essential that this court look to extrinsic aids to clarify the legislative scheme underlying the statutory language. Furthermore, this inquiry requires a consideration of the relationship between the federal and state laws as they are to be applied, not merely as they are written.
Reference to legislative history is appropriate not only where the statutory language is ambiguous but also where a *308 literal interpretation would thwart the overall statutory scheme. International T &T Corp. v. General T. & E. Corp., 518 F.2d 913, 921 (9 Cir. 1975). It is to determine that overall statutory scheme that not only must the legislative history of the statute be examined but attention must also be given to the practical effects of each proffered interpretation. In such a circumstance the New Jersey Supreme Court, in N.J. Pharmaceutical Ass’n. v. Furman, 33 N.J. 121, 162 A.2d 839 (1960), stated:
Courts may, of course, freely refer to legislative history and contemporaneous construction for whatever aid they may furnish in ascertaining the true intent of the legislation, [at 130, 162 A2d 839.]
Consequently, no rule of statutory construction should be permitted to block consideration of any legislative history which could be of aid to the court. See id.; In Re Meadowlands Communication Systems, Inc., 175 N.J.Super. 53, 65, 417 A.2d 575 (App.Div.1980), certif. den., 85 N.J. 455, 427 A.2d 556 (1980); Marsh v. Finley, 160 N.J.Super. 193, 197, 389 A.2d 490 (App.Div. 1978), certif. den., 78 N.J. 396, 396 A.2d 583 (1978); State v. Moody, 169 N.J.Super. 177, 404 A.2d 370 (Law Div. 1978). See, also, San-Lan Builders, Inc. v. Baxendale, 28 N.J. 148, 155, 145 A.2d 457 (1958), where the court counseled that “Scholastic strictness is to be avoided in the search for the legislative intention.”
At the outset it is readily apparent that § 114(c) does not preempt the field from state participation. By its history and very terms super fund seeks and provides for state participation as partners in the fight against pollution. As such, § 114(c) is not really a preemption clause as that term is classically used. The clause addresses “taxing” and not “participation.” Therefore, the initial determination to be made is whether spill fund imposes a double tax on plaintiffs in light of § 114(c) of super fund.[7]
*309 The enactment of super fund in 1980 was a compromise and was preceded by extensive studies and hearings by the Committee on Environment and Public Works concerning various predecessor measures (never adopted) and was accompanied by extensive floor debate. Particularly enlightening are the remarks of Senator Randolph concerning preemption during the Senate floor debate on super fund.[8]
Mr. President, let me state categorically that there is nothing in this bill that affects the uses to which a state may put the existing cleanup fund. This bill is silent on the subject. Thus a state may, after enactment of this bill, continue to spend its existing funds for any purpose that is lawful under state law.
If, after enactment of this bill, a state continued to pay claims from a state fund, that would not be contrary to any provision of this bill. What this bill does is prohibit a state from requiring any person to contribute to any fund if the purpose of that fund is to com/amsate for a claim paid for under the provisions of this bill...
Putting it simply, this is a prohibition against double taxation for the same purposes. It is not a prohibition on the uses that a state may make of its money, nor does it prohibit a state from imposing fees or taxes for other purposes connected with cleanup or restoration activities such as the purchase of pollution abatement equipment or the hiring or training of personnel for pollution prevention programs.
In summary, Mr. President, this preemption provision is narrow in scope and limited to the particular purpose of preventing double taxation. [126 Cong.Rec. S. 14981 (daily ed., November 24, 1980); emphasis supplied]
Moreover, at the end of the colloquy, the following question by Senator Bradley (of New Jersey) elucidated Senator Randolph’s position:
*310 Mr. Bradley: Finally, if the federal government determines that the needs at other sites require that federal efforts be terminated at the first site before that site is completed, may a state fund complete the effort?
Mr. Randolph: This legislation would permit that to happen. [Id.]
These remarks can only have been intended to mean that a state can tax local industries to support a fund dedicated to the purpose of compensating claims and costs not actually paid by super fund. Furthermore, any attempt to limit Senator Randolph’s remarks to the use of state-collected taxes prior to the effective date of super fund is unfounded in view of the following statements which clearly were directed to the use of state funds obtained after super fund implementation.
Mr. Bradley: Am I correct in assuming that monies expended by state funds can be used to provide the required 10 percent state match?
Mr. Randolph: That is correct.
Mr. Bradley: And am I also correct in noting that state funds are preempted only for efforts which are in fact paid for by the federal fund and that there would be no preemption for efforts which are eligible for federal funds but for which there is no reimbursement?
Mr. Randolph: That is correct. [126 Cong.Rec. S 14981 (daily ed. November 24, 1980); emphasis supplied]
The Randolph interpretation, which would enable states to tax for remedial actions not actually compensated under super fund, comports with a prohibition against double taxation in that states are still prevented from taxing to pay for cleanups actually financed by the Federal Government. Consequently, plaintiffs would not be put in the position of paying twice for the same activity. Based on this interpretation, New Jersey’s tax covering hazardous waste cleanups could simply be adjusted to reflect the infusion of federal funds pursuant to super fund. If super fund monies result in a reduction of the state’s spending requirements, that reduction can simply be reflected in a decrease in the imposition of state taxes.
In that regard the additional comments of Senator Randolph in response to a question from Senator Bradley are pertinent:
Mr. Bradley: In the event I have described, where a state or a contractor of the state is the respondent to the release and incurs economic loss normally compensable under the provisions of this bill, does this legislation intend that a state that has continued to collect taxes or fees to finance a state fund designed to cover expenses and economic loss not covered under the provision of this bill *311 have the right to use those state fund monies to provide intermediate, up front capital to pay for these activities and seek reimbursement from the fund established under this bill?
Mr. Randolph: Nothing in the language or intent of this bill would prohibit a state from using its fundgfor the purposes you have inquired about. The purpose of this legislation is simply to preempt double taxation of the substances enumerated in the bill for the purposes of compensation of the covered damages. The situation described in your inquiry is a question of bookkeeping rather than a subject or preemption. The expenditures by a state from its fund are temporary in nature and would be reimbursed and therefore ultimately paid from the fund established in this legislation. [126 Cong.Rec. S. 14981 (daily ed., November 24, 1980), emphasis supplied]
It is important to note that spill fund, as presently constituted, does protect industry from any threat that New Jersey would stockpile spill tax revenues. Spill fund limits the annual amount of revenue that can be collected, N.J.S.A. 58:10-23.11h(b), and also provides that the tax will be suspended in the event that the balance in spill fund equals or exceeds $50,000,-000. Id.
The court also endorses the Randolph interpretation of preemption because that interpretation coincides with the overriding remedial purpose of super fund. See San-Lan Builders, Inc. v. Baxendale, supra, which stands for the proposition that the policy and purpose of enactment as a whole is to be used in interpreting specific statutory language in accord with legislative intent. Accord, N.J. Builders, Owners and Managers Ass’n v. Blair, 60 N.J. 330, 338, 288 A.2d 855 (1972). If § 114(c) is read to preempt all state taxation for hazardous waste cleanups, the clause would undermine the salutary statutory goals of super fund and would'result in actually limiting the number of cleanups which could otherwise be initiated by the state in spite of the fact that super fund was intended to expand cleanup efforts.
A permissive construction of the word “may” would also do violence to the Congressional intent in light of the practicalities of the overall problem and the conditions existing at the time of the passage of super fund. The word “may” is often used similary to “can,” “could,” “to 1x3 able.” It is further used in the sense of “implying power or ability or possibility with a contingency.” See Webster’s New Collegiate Dictionary (1979). In *312 attributing any of these meanings to the term the obvious conclusion is that a state cannot collect a tax if its purpose is to pay a claim or cost which can, could or may possibly be paid by the Federal Government (assuming approval is given). This interpretation defies logic and common sense when viewed in light of super fund’s dependency on state participation to accomplish its goals, its own limitations and the purposes of both acts.
With respect to dependency it has already been noted that, in the adoption of super fund, Congress implicitly acknowledged that direct state action is necessary to assure adequate response action to spills. See §§ 104(c)(2), 104(c)(3), 104(d)(1), 111(f), 112, 114(a). Clearly, therefore, Congress envisioned active state financial, technical and administrative support as an integral part of the overall effort to combat the pollution problem. Under these circumstances it is unrealistic to assume that it was the intent of Congress to prohibit states from collecting and using industry contributions simply because a state may expend those funds on a cleanup program which may be a target for super fund expenditures. If a state is prohibited from collecting such funds from a source found by the State Legislature to be the most equitable — a finding which was shared by Congress in enacting super fund — for use in response actions which may also be eligible but which may never be declared eligible or paid under super fund, a state is faced with either abandoning many containment, cleanup and remedial programs or transferring a tremendous burden to its citizens.[9]
Concerning its limitations it was also recognized by members of Congress that the funding level established in super fund is insufficient to address the magnitude of the problem. See 126 Cong.Rec. S 15007-(daily ed. November 24, -1980) (remarks of Senator Stafford); S.Rep.No.848, 96th Cong.2d Sess. at 17 and *313 71. Since super fund allocates only $1.6 billion over a five-year period to remedy hazardous waste sites and spills throughout the 50 states, it is clear that only a small part of the overall cleanup problem can be addressed through the federal legislation. This is especially true when the $1.6 billion is compared to the $4.1 billion originally proposed and the 1979 EPA estimate that it could cost as much as $22.1 billion to clean up all known abandoned hazardous waste sites, to say nothing of emergency spills. See S.Rep.No.848, 96th Cong., 2d Sess. at 17; H.R.Rep. No.96-1016, 96th Cong., 2d Sess. at 20, reprinted in [1980] U.S.Code Cong. & Ad.News 6119, 6123.
In further recognition of these funding limits Congress directed the Federal Government to promulgate a National Contingency Plan within 180 days after the enactment of super fund to institute a priority system to govern federal funding. The act directs that the National Contingency Plan contain “criteria for determining priorities among releases or threatened releases throughout the United States for the purpose of taking remedial action and, to the extent practicable, taking into account the potential urgency of such action, for the purpose of taking removal action.” § 105(8)(A). This section also provides that such criteria be based upon relative risk or danger to the public health and other such factors. Id.; see also, § 105(8)(B). This direction and criteria clearly indicate that Congress was aware that super fund, as designed and funded, can reach only “top priority” sites.
Where sites or spills do not satisfy either the general priority criteria set forth in § 105 or the specific priority criteria yet to be adopted in the National Contingency Plan, a state must be permitted to rely on its own industry supported fund to remedy the situation. It simply strains credulity to say that hazardous waste sites or spills not meeting the criteria are claims which “may be compensated” under super fund. Only the future will tell whether such unqualified sites are large or small, many or few, but what is certain is that the adoption of plaintiffs’ interpretation of § 114(c) will leave untouched, at the very least, *314 some problem areas — a result which is clearly contrary to the scope and purpose of both super fund and spill fund.
The mere possibility that the tax paid to two governmental entities will be used for identical purposes must be distinguished iron) those situations wherein identical expenditure must necessarily arise. Neither the express language of super fund nor its criteria (in the absence of a National Contingency Plan it cannot be said that any specific criteria exist) demands the conclusion that there ever will be such a head-on collision of identical expenditures of the tax monies. A mere possibility of double taxation should not be deemed sufficient to extinguish a state’s right to collect a tax such as is in question here. Plaintiffs’ reliance on an argument that there could be — not that there must be — expenditures for identical purposes misapprehends the nature of the doctrine of preemption. A mere potential expenditure which may be made in the future will not invalidate state authority. More than mere generalizations or speculative expenditures is required for a court to stifle a state’s right to collect this tax.
There is also force to this position when one recognizes that the Environmental Protection Agency’s cost estimates do not include the cost of cleaning up hazardous substance pollution from sources other than dump, sites, such as accidental spills or discharges. See H.R.Rep.No.96-1016, 96th Cong., 2d Sess., reprinted in [1980] U.S.Code Cong. & Ad.News 6139 (comments of Representative Gore to the effect that $600 million would cover the cleanup of only approximately 70 sites out of the thousands that urgently need attention). See, generally, 126 Cong.Rec. S. 15007 (daily ed., November 24, 1980) (remarks of Senator Stafford); id. at S. 14972 (remarks of Senator Tsongas). Obviously, in the case of emergency, where accidental spills are not within the effective exercise or active range of federal administration, the Congress must content itself to allow the states to use industry tax funds. The ability to use such funds to make such expenditures is critical to a state which must be able to move without delay when volatile situations arise. To forbid a state from raising tax money altogether. for hazardous substance *315 cleanups and to depend strictly on general revenues for funding would effectively disable a state from responding to emergency situations. It cannot be said the Congress would deprive the states of a primary source of funds for the purposes of combating situations over which the Federal Government neither chooses to nor, as a practical matter, could control. A contrary conclusion would be inconsistent with a proper regard for the interplay of state and national interests.
The scheme of super fund is one which allows, but does not require, cooperation of the federal and state regimes. If a state chooses, or if the Federal Government through disapproval of a state request requires it, to take either the lead or the entire financial responsibility of cleaning up a specific spill problem, it should be free to use an industry supported fund to do so. In such instances the possibility that the financial burden on a state is greater than it may have been had the Federal Government done the cleanup work can afford plaintiffs no comfort in their arguments against the constitutionality of the state tax. Additionally, it is noted that that question is not before this court.
Against this background the court finds that § 114(c) of super fund does not preempt the State of New Jersey from collecting a spill tax to be used to pay hazardous waste cleanup costs and related claims not covered or actually compensated under super fund.
While this finding effectively disposes of plaintiffs’ claim, the court finds that there exists another, and equally compelling, reason why plaintiffs’ motion must be denied. Even if it were found that industry-supported tax monies could not be collected for general containment, cleanup and remedial purposes, the spill fund law nevertheless encompasses many other areas to which such monies could be devoted which are clearly outside the reach of § 114(c) and which may very well be of sufficient magnitude to sustain the spill fund tax. As noted earlier, plaintiffs’ sole attack against spill fund is based on the preemption provisions of § 114(c). Except for the federal Supremacy *316 Clause argument based on § 114(c), plaintiffs neither raised nor attempted to support any argument that the taxing provisions of spill fund were violative of any other constitutional rights. Thus, plaintiffs do not suggest that there is an actual conflict between the limited purposes of super fund and the overall policy enunciated by New Jersey in spill fund. Indeed, it may be said that the complete enforcement of the state act might well effectuate the policy of the federal statute.
It is noted first that § 114(c) explicitly exempts from its provisions a state tax on the petrochemical industries in order to finance (1) the purchase of hazardous response equipment, (2) the prepositioning of such response equipment and (3) other preparations for the response to a release of hazardous substances. Spill fund specifically authorizes such use of its fund monies. N.J.S.A. 58:10-23.11o(4). Clearly, the spill fund tax is valid in so far as such monies are used to satisfy these purposes.
That these categories do not represent the exclusive purposes to which spill fund tax monies may be devoted is disclosed by a comparison of the coverage of the two acts. It is first noted that super fund, by its very definition of hazardous substance and pollutant and/or contaminant, excludes petroleum and crude oil. § 101. Compare N.J.S.A. 58:10-23.11b(k). Petroleum spills, not being compensable under super fund, it is clear that the spill fund tax may be collected and used to pay such claims — an additional nonpreempted use of tax revenues which is authorized by the New Jersey Act.
Similarly, super fund makes no provision for the compensation of nongovernmental, third-party damage claims. N.J.S.A. 58:10-23.11g(a)(l) makes spill fund liable for all such direct and indirect damages caused by a discharge of hazardous substances. Accordingly, such claims are within the scope of proper spill fund spending under § 114(c).
Additionally, spill fund authorizes payments for income or property value losses caused by damage resulting from a discharge of hazardous substances. Furthermore, spill fund covers the cost of restoration or replacement of natural resources *317 damaged or destroyed by a discharge. Conversely, super fund provides limited damage coverage in relation to natural resources and authorizes such compensation only if the release occurred after December 11, 1980 and only if the claimants are the United States or a state. Compare §§ 107(a)(4)(A), 107(f), 111(c)(2), and 111(d)(1) with NJ.S.A. 58:10-23.11g(a). Furthermore, super fund does not explicitly cover state fund administrative expenses and clearly does not support spill fund administrative costs relating to petroleum spills, the reimbursement of third-party damage claims, and other claims not compensable under the federal act. Accordingly, these expenditures are also proper objects of spill fund spending.
Additionally, § 104(c)(3) of super fund specifically provides that a state must contribute 10% or more “of the costs of remedial action including all future maintenance,” in order to qualify for federal funding. This expenditure obviously represents a cost or claim which cannot be compensated by super fund and accordingly is beyond the preemptive scope of § 114(c) and thus a proper object of state taxation and spill fund spending. Additionally, a state is free to provide up-front operating dollars from its industry-supported spill fund to finance remedial activities on a temporary basis pending super fund reimbursement.
Clearly, it is evident that the foregoing areas are appropriate subjects of spill fund taxing in that they are not precluded by super fund. That conclusion is supported by the comments made by key legislators in connection with the debates surrounding the adoption of super fund, and particularly those (earlier noted) of Senator Randolph. See 126 Cong.Rcc. S. 14981 (daily ed., November 24,1980) (remarks of Senators Bradley and Randolph). The remarks by these legislators clearly indicate that industry-supported state funds may be used to pay for costs associated with releases of hazardous substances which are not covered by super fund.
Plaintiffs argue, however, that these nonpreempted areas are peripheral in nature and cannot be severed from the overriding *318 purposes of the state act, i.e., cleanup and removal costs of spills. According to plaintiffs, there exists no possibility that the State Legislature could have intended the tax to remain in effect if the principal object — cleanup and removal costs — is deleted from the State’s operation.
Spill fund (N.J.S.A. 58:10-23.11w) contains a general sever-ability clause which provides that
If any section, subsection, provision, clause or portion of this act is adjudged unconstitutional or invalid by a court of competent jurisdiction, the remainder of this act shall not be affected thereby.
The rule of severability was succinctly set forth in Affiliated Distillers Brands Corp. v. Sills, 60 N.J. 342, 289 A.2d 257 (1972):
Severability is a question of legislative intent. That intent must be determined on the basis of whether the objectionable feature of the statute can be excised without substantial impairment of the principle object of the statute. 56 N.J. at 265 [266 .4.2(1 579]; N. J. Chapter Am. I.P. v. N.J. State Board of Professional Planners, 48 N.J. 581, 593 [227 A.2d 313] appeal dismissed and cert. denied, 389 U.S. 8, [88 S.Ct. 70, 19 L.Ed.2d 8] (1967); Angermeier v. Boro, of Sea Girt, 27 N.J. 298, 311 [142 A.2d 624] (1958). To justify severance of a part of a statute “there must be such a manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative.” Washington National Insurance Company v. Board of Review, 1 N.J. 545, 556 [64 A.2d 443] (1949); Yallow v. Seven Oaks Park, Inc., 11 N.J. 341, 361 [94 A.2d 482] (1953). [at 345-346, 289 A.2d 257.]
Although plaintiffs may characterize petroleum spill cleanups as a “peripheral” purpose of spill fund, the act does not support such a conclusion in spite of the fact that in the first four years of its existence the spill fund did disburse 93% of its revenue for the cleanup and containment of nonpetroleum hazardous waste substances. That the spill fund has not incurred substantial expenses for oil spill cleanups reflects the good fortunes of New Jersey and should not be considered a diminishment of the importance of the portions of the act relating to petroleum spills.
Furthermore, the legislative findings set forth in N.J.S.A. 58:10-23.11a emphasize the need to protect New Jersey’s coastal areas and tourist trade from oil spills:
The Legislature finds and declares: that New Jersey’s lands and waters constitute a. unique and delicately balanced resource; that the protection and *319 preservation of these lands and waters promotes the health, safety and welfare of the people of this State; that the tourist and recreation industry dependent on clean waters and beaches is vital to the economy of this State; that the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction; and that the storage and transfer of petroleum products and other hazardous substances between vessels, between facilities and vessels, and between facilities, whether onshore or offshore, is a hazardous undertaking and imposes risks of damage to persons and property within this State.
The Legislature finds and declares that the discharge of petroleum products and other hazardous substances within or outside the jurisdiction of this State constitutes a threat to the economy and environment of this State. The Legislature intends by the passage of this act to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other ]>ersons damaged by such discharge.
Only the future will tell whether spill fund spending scales will continue to be balanced in favor of nonpetroleum spill requirements.
Additionally, spill fund itself indicates a legislative recognition that the statute should be read in conjunction with other laws and should survive federal entrance into the hazardous waste cleanup field. In recognition of the possible entry of the Federal Government into the field, N.J.S.A. 58:10 23.11z provides:
If the United States Congress enacts legislation providing compensation for the discharge of petroleum and hazardous products, the Commissioner shall determine to what degree that legislation shall provide for the needed protection for our citizens, businesses and environment and shall make the appropriate recommendation to the legislature for amendments to this Act.
Such provision evinces a legislative intent that every purpose of spill fund was to be accomplished.
Moreover, the Legislature specifically envisioned that the spill act would be enforced in conjunction with any other applicable law. In N.J.S.A. 58:10-23.11v the Legislature specifically provided that *320 Under the statute as presently written, then, the spill act must be administered in conjunction with, and supplementary to, any federal programs in the hazardous waste area.
*319 Nothing in this act shall be deemed to preclude the pursuit of any other civil or injunctive remedy by any person. The remedies provided in this act are in addition to those provided by existing statutory or common law, but no person who receives compensation for damages or cleanup costs pursuant to any other State or Federal law shall be permitted to receive compensation for the same damages or cleanup costs under this act.
*320 In view of the foregoing the court finds that even if § 114(c) of super fund could be construed to preempt part of spill fund, the aforementioned nonpreempted areas are more than sufficient to sustain its continued validity. The underlying intent of spill fund simply indicates that the level of dependence between the alleged preempted and admitted nonpreempted areas that is necessary for this court to find the whole scheme inseparable is not present. Affiliated Distillers Brands Corp. v. Sills, supra.
The court finds that Congress, through the adoption of super fund, has not put an end to the taxing powers of the states for hazardous substance cleanup, containment and remedial purposes by putting another tax in its place. Rather, the court finds that super fund permits a state to continue to avail itself of industry tax funds with the obvious limitation that a double tax could not be collected and expended on any one project. Such would be the practicalities of government where both state and nation have the same and yet separate, identifiable interests. Such can be the only conclusion unless Congress leaves no doubt that the Federal Government is to be the sole recipient of the tax monies needed to effectuate such purposes so as to leave no room for concert. No such finding can be made here. This court believes that Congress has not preempted the right of states to protect their residents’ pocketbooks as well as their environment.
The third and fourth counts of Docket SC 319A-81TC survive judgment and will proceed to trial.[10] The Clerk of the Tax Court will enter judgments dismissing Docket SC 303A-81 in its entirety and Docket SC 319A-81TC as to counts one and two.

 42 U.S.C. § 9614(c).

The United States Constitution, Art. VI, cl. 2, provides: “This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”

Portions of an action ir^tituted by plaintiffs in the Superior Court of New Jersey, Chancery Division — Mercer County (Docket C 4530-80) which was transferred to the Tax Court (Docket SC 319A-81 TC) and consolidated herewith, survive this motion.

 A similar action, brought by plaintiffs in the United States District Court for the District of New Jersey, Civil Action 71-1458M, was dismissed on the basis that the Tax Anti-injunction Act, 28 U.S.C.A. § 1341, compelled that the matter be determined in a state court. Plaintiffs have appealed that decision to the United States Court of Appeals for the Third Circuit (No. 81-2514). The preemption issue was also raised by the State in a declaratory judgment action brought against the United States (State of New Jersey et al. v. United States of America et al., United States District Court for the District of Columbia, Civil Action No. 81-0945), by which a definitive interpretation of the scope and meaning of the preemption clause of super fund was sought. That action did not involve a review of the New Jersey taxing scheme pursuant to the spill act. It was dismissed. Similar declaratory judgment actions were brought in Lesniak et al. v. United States of America et al. (No. 81-977) and Merlino et al. v. United States of America et al. (No. 81-1914) in the United States District Court for the District of New Jersey. These matters were settled by stipulation. The State’s motion to make the provisions of those settlements part of the record of this controversy for consideration by the court was denied by separate opinion. Lastly, in State of New Jersey et al. v. Gorsuch et al., United States District Court for the District of Columbia, Civil Action No. 81-2269 the court entered an order directing the Environmental Protection Association to have a “National Contingency Plan” in place by May 11, 1982.
During the pendency of this action plaintiffs have continued to pay the spill fund tax according to its terms.

That each plaintiff is a major facility as defined in the spill fund act is not disputed.

While it may not be an eligible cost under the spill fund act as presently constituted, it is apparent that super fund contemplated that seed money, including at least a 10% matching fund, will be contributed by those states which seek to qualify for federal funding.

Preemption aside, neither party addressed the question of whether the spill fund taxing scheme is constitutionally prohibited. Plaintiffs relied on the provisions of § 114(c) as the sole support for their position.

The Randolph remarks in particular are entitled to great weight in interpreting the preemption provision because Senator Randolph was the chairman of the Committee on Environment and Public Works which reported the super fund bill to the Senate, was floor manager and a cosponsor of the measure, and was clearly involved in the last-minute negotiations leading up to the passage of the act. See, generally, 126 Cong.Rec.S. 14941-S. 15008 (daily ed. November 24, 1980). In FEA v. Algonquin SNG, Inc., 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976), the Supreme Court relied upon Senate floor debates for support in statutory construction and observed in relation to a particular excerpt from a debate that, “as a statement of one of the legislation’s sponsors, this explanation deserves to be accorded substantial weight in interpreting the statute.” Accord. Schwegmann Bros. v. Calvert Corp., 341 U.S. 384, 394, 71 S.Ct. 745, 750, 95 L.Ed. 1035 (1951); United States v. Oates, 560 F.2d 45 (2 Cir. 1977); International T & T Corp. v. General T. & E. Corp., 518 F.2d 913, 921 (9 Cir. 1975); 2A Sutherland, Statutory Construction, op. cit. § 48.04 at 197-198 and § 48.14 at 217-220.

Senator Bradley noted that in New Jersey there are at least 235 known hazardous waste sites requiring attention. 126 Cong.Rec. S 14971 (daily ed. November 24, 1980). The Environmental Protection Association has published a list of priority hazardous waste sites throughout the nation; only 12 of New Jersey’s 235 sites qualified for priority treatment under that list.

 in the third count of their complaint plaintiffs seek relief from payment of an alleged disproportionate share of the spill fund tax. In the fourth count plaintiffs demand judgment directing the Commissioner of.the Department of Environmental Protection to make recommendations to the New Jersey Legislature for amendments to spill fund pursuant to N.J.S.A. 58:10-23.1 lz.