EXXON CORPORATION, THE BF GOODRICH COMPANY, UNION CARBIDE CORPORATION, MONSANTO COMPANY, AND TENNECO CHEMICALS, INC., PLAINTIFFS-APPELLANTS, v. ROBERT HUNT, ADMINISTRATOR OF NEW JERSEY SPILL COMPENSATION FUND, CLIFFORD A. GOLDMAN, TREASURER OF THE STATE OF NEW JERSEY, SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION, AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

EXXON CORPORATION, THE BF GOODRICH COMPANY, UNION CARBIDE CORPORATION, MONSANTO COMPANY, AND TENNECO CHEMICALS, INC., PLAINTIFFS-APPELLANTS, v. ROBERT HUNT, ADMINISTRATOR OF NEW JERSEY SPILL COMPENSATION FUND, CLIFFORD A. GOLDMAN, TREASURER OF THE STATE OF NEW JERSEY, SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION, JERRY F. ENGLISH, COMMISSIONER OF ENVIRONMENTAL PROTECTION, AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued January 23, 1984—Decided September 19, 1984.

*John J. Carlin, Jr.*, argued the cause for appellants (*Farrell, Curtis, Carlin & Davidson*, attorneys).

*Mary C. Jacobson*, Deputy Attorney General, argued the cause for respondents (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *Michael R. Cole*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

CLIFFORD, J.

In this case we consider one aspect of the staggering problems associated with the release of hazardous substances into our environment. Cleanup and removal efforts have been authorized by the State through the New Jersey Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.11z (Spill Fund), and by the federal government pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 *U.S.C.A.* §§ 9601–9657 (Superfund). This appeal focuses on the taxing structures established by each of the foregoing Acts. More specifically, we address the issue of the constitutionality of Spill Fund—that is, whether the tax imposed by the federal government to create Superfund effectively preempts the tax instituted by the State of New Jersey to establish Spill Fund.

I

Plaintiffs are five petroleum and chemical companies that are currently paying taxes into both Spill Fund and Superfund. After several unsuccessful attempts to have the federal courts determine the scope of section 114(c) of Superfund, 42 *U.S.C.A.* § 9614(c) (see *Exxon Corp. v. Hunt*, 4 *N.J.Tax* 294, 299 n. 4 (1982), for a synopsis of those efforts), plaintiffs filed these

consolidated actions challenging the constitutionality of Spill Fund in light of section 114(c) of Superfund.[1]

The parties filed cross-motions for summary judgment. Plaintiffs argued that the Spill Fund tax was preempted by section 114(c) of Superfund, which reads:

> Except as provided in this chapter, no person may be required to contribute to any fund, the purpose of which is to pay compensation for claims for any costs of response or damages or claims *which may be compensated under this subchapter.* Nothing in this section shall preclude any State from using general revenues for such a fund, or from imposing a tax or fee upon any person or upon any substance in order to finance the purchase or prepositioning of hazardous substance response equipment or other preparations for the response to a release of hazardous substances which affects such State. [42 *U.S.C.A.* § 9614(c) (emphasis added).]

Plaintiffs maintained that the principal purpose of the state tax was to compensate hazardous-waste sites that might ultimately be compensated by Superfund, thereby contravening the above-emphasized language of section 114(c) of Superfund. Defendants, describing Spill Fund as a constitutionally-valid supplement to Superfund, argued that Spill Fund was aimed at providing compensation for those claims that were not receiving Superfund coverage.

Judge Evers granted defendants' motion for summary judgment in the Tax Court.[2]   4 *N.J.Tax* 294.   Relying on the legislative history surrounding the enactment of Superfund, as well as on the scope and purposes of both Superfund and Spill Fund, Judge Evers concluded that the Spill Fund tax was not preempted by Superfund.

> The court finds that Congress, through the adoption of [Superfund], has not put an end to the taxing powers of the states for hazardous substance cleanup,

---

[1]Plaintiffs filed two complaints, one in the Tax Court and one in the Chancery Division.  Both actions asserted that the tax imposed by Spill Fund was preempted by the provisions of Superfund.  The complaints differed only in that the Chancery Division action sought additional relief that is not at issue here.  On defendant's motion the Chancery Division action was transferred to and consolidated with the Tax Court action.

[2]All but two counts of plaintiffs' consolidated complaints were dismissed.  4 *N.J.Tax* 294, 320 (1982).  The remaining two counts were severed from the rest of the case for purposes of appeal.

containment and remedial purposes by putting another tax in its place. Rather, the court finds that [Superfund] permits a state to continue to avail itself of industry tax funds with the obvious limitation that a double tax could not be collected and expended on any one project. Such would be the practicalities of government where both state and nation have the same and yet separate, identifiable interests. [*Id.* at 320.]

Moreover, Judge Evers alternatively held that even if Spill Fund tax monies could not be collected for general containment and cleanup purposes, "the [S]pill [F]und law nevertheless encompasses many other areas to which such monies could be devoted which are clearly outside the reach of § 114(c) and which may very well be of sufficient magnitude to sustain the [S]pill [F]und tax." *Id.* at 315. Thus, the court held that "even if § 114(c) of [Superfund] could be construed to preempt part of [S]pill [F]und, the * * * nonpreempted areas [3] are more than sufficient to sustain its continued validity." *Id.* at 320 (footnote added).

On plaintiffs' appeal the Appellate Division affirmed, "substantially for the reasons stated by Judge Evers in his written opinion * * *." 190 *N.J.Super.* 131, 132–33 (1983).[4] We grant-

---

[3]The areas that Judge Evers found to be "non-preempted," and therefore eligible for Spill Fund compensation, included the following: the purchase and prepositioning of hazardous-response equipment; the cleanup of petroleum and crude oil spills; payment of third-party damage claims; and the Superfund provision that a state contribute ten percent or more of the costs of remedial action, including future maintenance, in order to qualify for federal funding (42 *U.S.C.A.* § 9604(c)(3)). 4 *N.J.Tax* at 316–17.

[4]During the time between the oral argument before Judge Evers and the rendering of his decision, the New Jersey Department of the Treasury published proposed regulations governing expenditures under Spill Fund. Plaintiffs submitted timely comments to these proposed regulations, but due to an error within the Department of the Treasury those comments were deemed to be "untimely and need not be considered." The regulations were thereafter adopted. Plaintiffs challenged the validity of the regulations by appeal to the Appellate Division. That appeal was subsequently consolidated with the appeal of Judge Evers' decision; and although the Appellate Division concluded that the Department of the Treasury had failed to comply with the Administrative Procedure Act and that the regulations were invalid and without force and effect, defendants have not sought review of that issue by the Court. We

ed certification, 94 *N.J.* 607 (1983), to determine whether "the plain language of § 114(c) of Superfund preempt[s] the State of New Jersey from collecting taxes under the taxing provision of the [Spill Fund] as presently enacted", and now affirm.

## II

Spill Fund was enacted in 1977, L.1976, c. 141, with the expressed legislative intent to

exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharge. [*N.J.S.A.* 58:10–23.11a.]

This statute provides for the establishment of "a nonlapsing, revolving fund in the Department of the Treasury to carry out the purposes of this act." *N.J.S.A.* 58:10–23.11i. The fund's revenues are supplied by a tax "levied upon each owner or operator of one or more major facilities [5] * * * to insure compensation for cleanup costs and damages associated with any discharge of hazardous substances * * *." *N.J.S.A.* 58:10–23.-11h(a) (footnote added).

In December 1980 Superfund was enacted in response to escalating national hazardous-waste problems. Congress provided for the establishment of a $1.6 billion fund over a five-year period [6] for the cleanup and removal of pollution caused by

---

therefore restrict our attention to the issue of preemption as considered by Judge Evers.

[5] A "major facility" is defined by the statute as including "any refinery, storage or transfer terminal, pipeline, deep water port, drilling platform or any appurtenance related to any of the preceding that is used or is capable of being used to refine, produce, store, handle, transfer, process or transport hazardous substances." *N.J.S.A.* 58:10–23.11b(*l*). It is undisputed that each plaintiff operates a major facility. 4 *N.J.Tax* at 301 n. 5.

[6]Superfund is scheduled to expire in 1985. However, on August 10, 1984 the House of Representatives passed H.R. 5640, "Superfund Expansion and Protec-

the release of hazardous substances into the environment. Superfund imposes a tax to finance the federal fund, taxing chemical industries to acquire 87.5% of the funds necessary for cleanup efforts and relying on general federal revenues to account for the remaining 12.5% of the fund. 126 *Cong.Rec.* S14967–68 (daily ed. Nov. 24, 1980) (statement of Sen. Stafford).

The focal point of plaintiffs' preemption argument is that language of section 114(c) of Superfund that excludes contribution to any fund whose purpose is to pay compensation for claims "for any costs of response or damages or claims which *may be compensated* under this subchapter." 42 *U.S.C.A.* § 9614(c) (emphasis added). Plaintiffs maintain that through this section of Superfund, read in conjunction with Article VI, clause 2 of the United States Constitution [7], Congress expressly preempted New Jersey's Spill Fund taxation scheme.

As Judge Evers noted,

[i]t is fundamental that where a state statute conflicts with a federal statute which has preempted the field and stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, the Supremacy Clause of the United States Constitution mandates that the state statute must fail. [4 *N.J.Tax* at 304.]

An allegation of preemption must be analyzed with reference to several general guidelines: "Does the federal statute expressly or by necessary implication indicate exclusivity? * * * Is the

tion Act of 1984," which provides for additional funding of $10.2 billion between 1985 and 1990. The bill, authored by Rep. James Florio of New Jersey, passed by a vote of 323 to 23. While the legislation must still face the scrutiny of the Senate, and ultimately the President, it appears likely that some form of Superfund legislation will be extended beyond 1985. See *infra* at 539– 541 & notes 8, 9.

7This clause of the United States Constitution, more commonly referred to as the supremacy clause, provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land, and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

federal scheme so pervasive that it precludes coexistence of state regulation? * * * [and] Does the state program stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'?". *U.S.A. Chamber of Commerce v. State*, 89 *N.J.* 131, 142 (1982) (citations omitted); *see also Feldman v. Lederle Laboratories*, 97 *N.J.* 429, 458 (1984) (discussing question of preemption in products liability field). However, courts faced with potentially conflicting state and federal statutes must attempt to harmonize them whenever possible. *Florida Lime & Avocado Growers v. Paul*, 373 *U.S.* 132, 83 *S.Ct.* 1210, 10 *L.Ed.*2d 248 (1963); *Huron Cement Co. v. Detroit*, 362 *U.S.* 440, 80 *S.Ct.* 813, 4 *L.Ed.*2d 852 (1960). "Pre-emption of state law by federal statute is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakenly so ordained.' " *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 *U.S.* 311, 317, 101 *S.Ct.* 1124, 1130, 67 *L.Ed.*2d 258, 264–65 (1981) (quoting *Florida Lime & Avocado Growers, supra*, 373 *U.S.* at 142, 83 *S.Ct.* at 1217, 10 *L.Ed.*2d at 257).

■ Thus, in determining the proper construction of allegedly conflicting statutes, courts must perform "essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Chicago & N.W. Transp. Co., supra*, 450 *U.S.* at 317, 101 *S.Ct.* at 1130, 67 *L.Ed.*2d at 265 (quoting *Perez v. Campbell*, 402 *U.S.* 637, 644, 91 *S.Ct.* 1704, 1708, 29 *L.Ed.*2d 233, 239 (1971)).

Moreover, as the Court in *Florida Lime & Avocado Growers, supra*, 373 *U.S.* 132, 83 *S.Ct.* 1210, 10 *L.Ed.*2d 248, explained, it is not a question of "whether the *purposes* of the two laws are parallel or divergent," but rather a court must determine "whether both regulations can be enforced without impairing the federal superintendence of the field * * *." *Id.* at 142, 83 *S.Ct.* at 1217, 10 *L.Ed.*2d at 156–57 (emphasis in original).

Although plaintiffs argue in favor of the "plain meaning" rule of statutory construction, see 2A *Sutherland Statutory Construction* § 46.01 (C.Sands 4th ed. 1973), we conclude, as did the Supreme Court in *Jones v. Rath Packing Co.*, 430 *U.S.* 519, 97 *S.Ct.* 1305, 51 *L.Ed.*2d 604 (1977), that "[t]his inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Id.* at 526, 97 *S.Ct.* at 1310, 51 *L.Ed.*2d at 614. The pertinent language of section 114(c), that "no person may be required to contribute to any fund, the purpose of which is to pay compensation for claims for any costs of response or damages or claims which *may be compensated* under this subchapter" (emphasis added), may appear to be clear *language* at first glance, but we can hardly conclude that it conveys a clear and unambiguous *meaning* in light of the purpose and spirit of Superfund as a whole. We are reminded of Judge Learned Hand's ubiquitous observation of some forty years ago:

There is no surer way to misread any document than to read it literally * * *. * * * As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and although their words are by far the most decisive evidence of what they would have done, they are by no means final. [*Guiseppi v. Walling*, 144 *F.*2d 608, 624 (2d Cir.1944) (L. Hand, J., concurring), aff'd *sub nom. Gemsco, Inc. v. Walling*, 324 *U.S.* 244, 65 *S.Ct.* 605, 89 *L.Ed.* 921 (1945).]

As plaintiffs read "may be compensated", the phrase implicates only a permissive meaning. In other words, plaintiffs claim that if New Jersey's Spill Fund has as its purpose to pay compensation for claims that "might conceivably be compensated" by Superfund, then plaintiffs cannot be required to pay into Spill Fund. Thus, plaintiffs maintain that the Court's function is to apply the statute according to its stated terms without the aid of legislative history or extrinsic evidence.

However, as Judge Evers pointed out, "[t]he seemingly simple, but often misused and misapplied word 'may' is anything but unambiguous." 4 *N.J.Tax* at 307. The standard-dictionary definition of the word "may" ranges from "have the ability or

competence to," *Webster's Third New International Dictionary* 1396 (1971), and "be in some degree likely to," *id.*, to "shall, must—used esp[ecially] in deeds, contracts, and statutes," *id.*, and "shall, must—used in law where the sense, purpose, or policy requires this interpretation," *Webster's New Collegiate Dictionary* 711 (1976). A legal-dictionary definition of the word "may" states that "[r]egardless of the instrument, however, whether constitution, statute, deed, contract or whatever, courts not infrequently construe 'may' as 'shall' or 'must' to the end that justice may not be the slave of grammar." *Black's Law Dictionary* 883 (rev. 5th ed. 1979). One court discussed this dilemma in *Kraft v. Board of Educ. for D.C.*, 247 *F.Supp.* 21 (D.D.C.1965), *cert. denied*, 386 *U.S.* 958, 87 *S.Ct.* 1026, 18 *L.Ed.*2d 106 (1967):

> It is well established, however, that the word "may" can be construed to be "shall", just as the word "shall" may be construed to mean "may". The interpretation of those words depends upon the context in which they are used and the intention of the legislative body as is shown by the statute and as may be gleaned from committee reports and similar authoritative sources. [*Id.* at 24–25.]

*Accord Bell v. Western Employer's Ins. Co.*, 173 *N.J.Super.* 60, 65 (App.Div.1980) (in dictum, noting that "may" and "shall" "may be deemed interchangeable when necessary to execute the clear intent of the Legislature"); *MacNeil v. Ann Klein*, 141 *N.J.Super.* 394, 402 (App.Div.1976) (in dictum, "the word 'may' should be given the meaning which conforms to the legislative intent").

Thus, plaintiffs' reliance on any notion of a "plain meaning" rule in this situation must fail. Moreover, as Judge Evers stated, "[r]eference to legislative history is appropriate not only where the statutory language is ambiguous but also where a literal interpretation would thwart the overall statutory scheme." 4 *N.J.Tax* at 307–08 (citing *International T & T Corp. v. General T. & E. Corp.*, 518 *F.*2d 913, 921 (9th Cir.1975)). We therefore direct our attention to the meaning of section 114(c) in the context of the supportive provisions of

Superfund and the legislative background of the whole of Superfund.

Although it may be true that many of the purposes to which Superfund moneys are put overlap with the purposes of Spill Fund, this fact alone does not require a conclusion of preemption. In *Florida Lime & Avocado Growers, supra,* 373 *U.S.* 132, 83 *S.Ct.* 1210, 10 *L.Ed.*2d 248, the Court stated that the contention that such a situation compels preemption tends to "obscure more than aid in the solution of the problem. * * * This Court has, on the one hand, sustained state statutes having objectives virtually identical to those of federal regulations * * * and has, on the other hand, struck down state statutes where the respective purposes were quite dissimilar * * *." *Id.* at 141–42, 83 *S.Ct.* at 1217, 10 *L.Ed.*2d at 256 (citations omitted). Hence, it is far more useful to examine a challenge of preemption in the light of what Congress intended the relationship to be between Superfund and state statutes such as Spill Fund.

Whereas plaintiffs contend that the language used in section 114(c) of Superfund demonstrates an intent on the part of Congress to repose in the federal government exclusively the power to maintain a fund for the cleanup and removal of hazardous substances, it is clear from the surrounding provisions of Superfund and its legislative history that Congress actually envisioned a cooperative arrangement between the federal and state governments. Superfund recognizes its limits and in fact provides for active state financial and technical cooperation in hazardous-waste cleanup activities. *See, e.g.,* 42 *U.S.C.A.* § 9604(c)(2) (requires consultation by President with affected states prior to determination of any appropriate remedial action); 42 *U.S.C.A.* § 9604(c)(3) (mandates a minimum level of state financial and technical (contract or cooperative agreement) participation as a prerequisite to receiving federal cleanup funds); 42 *U.S.C.A.* § 9604(d)(1) (encourages states with the capability to carry out cleanup actions to do so with reimbursement from Superfund); 42 *U.S.C.A.* § 9605(4) (re-

quires adoption of National Contingency Plan setting forth, among other things, "appropriate roles and responsibilities for the Federal, State, and local government * * * in effectuating the plan"); and 42 *U.S.C.A.* § 9614(a) ("Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substance within such State.") These provisions exemplify the intended interdependence between Superfund and state programs.

Courts frequently refer to events occurring immediately prior to the time of enactment as an extrinsic aid in fathoming legislative intent. *See* 2A *Sutherland Statutory Construction, supra,* at § 48.04. Of persuasive significance, therefore, is the colloquy between Senator Bradley of New Jersey and Senator Randolph of West Virginia that preceded the enactment of Superfund. Because Senator Randolph was the chairman of the Committee on Environment and Public Works, which reported the Superfund bill to the Senate, as well as floor manager and cosponsor of the measure, his explanations and comments with respect to the interpretation of Superfund provisions deserve particular deference. *See* 126 *Cong.Rec.* S14941–15008 (daily ed. Nov. 24, 1980); *see also F.E.A. v. Algonquin SNG, Inc.,* 426 *U.S.* 548, 564, 96 *S.Ct.* 2295, 2304, 49 *L.Ed.*2d 49, 60 (1976) (relying on Senate floor debates for support in statutory construction, the Court pointed out that "as a statement of one of the legislation's sponsors, this explanation deserves to be accorded substantial weight in interpreting the statute"); *Brennan v. Corning Glass Works,* 480 *F.*2d 1254, 1260 (3d Cir.1973) (recognizing that "a sponsor's views are entitled to great weight"); 2A *Sutherland Statutory Construction, supra,* at § 48.15 (noting "reality of legislative practice" that legislators look to sponsors as sources of information concerning a bill's purpose, meaning, and intended effect).

Senator Bradley set the tenor of his dialogue with Senator Randolph by expressing the following concerns and identifying the issues that their comments would attempt to clarify:

New Jersey and several of the other States with successful State spill funds (including Michigan, Florida, California, Maryland, and New York) have on repeated occasions expressed grave concerns that the preemption language contained in this bill may work to slow down governmental response to spills of oils and hazardous wastes by creating questions as to the availability of State and [/]or Federal funds to provide operating, up front dollars to finance emergency cleanup and containment actions. I understand the concern debated over the years in conjunction with superfund that industry not be forced to suffer a double tax for the same functions carried out by different levels of government.

     \*       \*       \*       \*       \*       \*       \*       \*

Mr. President, in order to clarify the remaining questions concerning allowable State activity under this bill's preemption language, I wonder if the Senator [Randolph] from West Virginia would consent to a few questions on this issue? [126 *Cong.Rec.* S14981 (daily ed. Nov. 24, 1980).]

The colloquy that followed these introductory remarks leaves little doubt that section 114(c) was not intended as a total preemption of state involvement in hazardous-waste cleanup efforts. First, the remarks of Senator Randolph lend strong support to that conclusion:

[Mr. BRADLEY.] Am I correct in understanding that it is the purpose of this legislation to prohibit States from requiring any person to contribute to a fund for the purpose of reimbursing claims already provided for in this legislation?
Mr. RANDOLPH. Yes, that is the clear intent. The purpose is to prohibit States from creating duplicate funds to pay damage compensable under this bill.
Mr. BRADLEY. However, there is no such preemption of a State's ability to collect such taxes or fees for other costs associated with releases that are not compensable damages as defined in this legislation.
Mr. RANDOLPH. The Senator is correct. [*Id.*]

Should any doubt remain, the following excerpts establish that the interrelationship between Superfund and state cleanup funds allows for state funds to fill in the gaps left by Superfund:

Mr. RANDOLPH. \* \* \* What this bill does is prohibit a State from requiring any person to contribute to any fund if the purpose of that fund is to compensate for a claim paid for under the provisions of this bill.

     \*       \*       \*       \*       \*       \*       \*       \*

Putting it simply, this is a prohibition against double taxation for the same purposes. It is not a prohibition on the uses that a State may make of its money, nor does it prohibit a State from imposing fees or taxes for other purposes connected with cleanup or restoration activities such as the purchase

of pollution abatement equipment or the hiring or training of personnel for pollution prevention programs.

In summary, Mr. President, this preemption provision is narrow in scope and limited to the particular purpose of preventing double taxation.

Mr. BRADLEY. Am I correct in assuming that moneys expended by State funds can be used to provide the required 10 percent State match?

Mr. RANDOLPH. That is correct.

Mr. BRADLEY. And am I also correct in noting that State funds are preempted only for efforts which are in fact paid for by the Federal fund and that there would be no preemption for efforts which are eligible for Federal funds but for which there is no reimbursement?

Mr. RANDOLPH. That is correct.

Mr. BRADLEY. Finally, if the Federal Government determines that the needs at other sites require that Federal efforts be terminated at the first site before that site is completed, may a State fund complete the effort?

Mr. RANDOLPH. This legislation would permit that to happen. [*Id.*]

As the Tax Court noted, "[t]he Randolph interpretation, which would enable states to tax for remedial actions not actually compensated under super fund, comports with a prohibition against double taxation in that states are still prevented from taxing to pay for cleanups actually financed by the Federal Government." 4 *N.J.Tax* at 310.

This conclusion, that Superfund preempts state taxation only when the state fund thereby created is used to compensate cleanup activities already compensated by Superfund, finds support also in the recent comments of the House of Representatives Committee on Energy and Commerce.[8] In its Report

---

[8]In this connection we are reminded that "while the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, * * * such views are entitled to significant weight * * * and particularly so when the precise intent of the enacting Congress is obscure." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 *U.S.* 572, 596, 100 *S.Ct.* 800, 814, 63 *L.Ed.*2d 36, 54 (1980) (citations omitted); *accord Bell v. New Jersey & Pennsylvania*, 461 *U.S.* 773, ——, 103 *S.Ct.* 2187, 2194, 76 *L.Ed.*2d 312, 323 (1983) ("[T]he view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value."); *Edwards v. Mayor and Council of Moonachie*, 3 *N.J.* 17, 24 (1949) ("[W]hile entitled to due consideration, the subsequent legislative construction of a statute is not conclusive of the significance of the prior act."). *But cf. Garden State Farms, Inc. v. Bay*, 77 *N.J.* 439, 453 (1978) ("We believe that '* * * caution must be exercised in using the action of the

dated July 16, 1984, the Committee on Energy and Commerce, to which H.R. 5640 ("Superfund Expansion and Protection Act of 1984") was referred, addressed Superfund's relationship to other law and, in particular, the pending bill's repeal of Superfund's preemption provision:

> The section repeals the provision of current law which preempts state taxing authority in certain circumstances. The Committee is aware that the current law's preemption of state taxing authority has been interpreted by some to constitute a total elimination of state authority in this area. *The Committee believes that the proper interpretation of current law is that its preemption provision was intended only to preclude states from imposing taxes or otherwise requiring contributions to funds which would pay costs or damages that would be actually compensated by Superfund.* To avoid any possible misinterpretation of the law which could further restrict the states' efforts to raise the funds necessary to meet their matching share obligations under the program, the legislation repeals the current law's preemption provision in its entirety.[9] [*H.R.Rep.No.* 890, Part 1, 98th Cong., 2d Sess. 58–59 (1984) (footnote and emphasis added).]

Thus, not only does the colloquy between Senators Bradley and Randolph support the conclusion that total preemption was not intended, but Congress itself is now trying to clarify what it views as a misinterpretation of the enacting Congress' intent.

---

legislature on proposed amendments as an interpretative aid' in discerning legislative intent. 2A *Sutherland, Statutory Construction,* § 48.18 at 225 (Sands ed.1973)."); *Schmoll v. Creecy,* 54 *N.J.* 194, 203 (1969) ("Indeed, the question as to the intent of [one] Legislature * * * is a judicial question as to which neither the action nor inaction of a subsequent Legislature can be dispositive.").

On May 10, 1984, H.R. 5640 was referred jointly to the Committees on Energy and Commerce and Public Works and Transportation for a period ending not later than July 24, 1984, as well as to the Committee on Ways and Means. On August 10, 1984 the House of Representatives passed H.R. 5640. *See supra* note 6, at 531–532. Thus, although we realize that this legislation is pending senatorial and presidential approval, we find that the relevancy of the statements contained in the Committee report should not be overlooked.

[9]If enacted, section 118 of the legislation would amend section 114(c) of Superfund to read as follows:

(c) Notwithstanding any provision of this or any other law, a State may require any person to contribute to any fund the purpose of which is to pay compensation for claims for any costs of response or damages which may be compensated under this Act. [*H.R.Rep.No.* 890, Part 1, 98th Cong., 2d Sess. 12 (1984).]

We note too that when enacted, Superfund was recognized by various members of Congress as providing for an insufficient funding level to tackle the cleanup and removal of hazardous-waste sites that existed at that time. *See* 4 *N.J.Tax* at 312–13. *See generally* 126 *Cong.Rec.* S15007 (daily ed. Nov. 24, 1980) (remarks of Sen. Stafford); *S.Rep.No.* 848, 96th Cong., 2d Sess. 17, 71 (1980); *H.R.Rep.No.* 1016, 96th Cong., 2d Sess. 20 (1980), *reprinted in* 1980 *U.S. Code Cong. & Ad. News* 6119, 6123. This feature—the inadequacy of Superfund to meet cleanup needs—emphasizes Congress' probable intent to allow states to continue their own efforts to assist in cleanup activities.

Another source of interpretive information is the comments made by the federal administrative agency charged with the authority to implement the statute in question. "It is a fundamental maxim that the opinion as to the construction of a regulatory statute of the expert administrative agency charged with the enforcement of that statute is entitled to great weight and is a 'substantial factor to be considered in construing the statute.'" *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 575 (1978) (citing *Youakim v. Miller,* 425 *U.S.* 231, 235, 96 *S.Ct.* 1399, 1402, 47 *L.Ed.*2d 701, 706 (1976)). In this case that agency is the Environmental Protection Agency. In an Executive Summary memorandum, the Administrator of the EPA discussed the preemption issue and stated that section 114(c) of Superfund "does not apply to State funds which are used * * * : * * * To compensate damage claims and to remove or remedy releases of hazardous substances eligible to be financed by [Superfund] but for which no federal reimbursement is provided." *Office of Emergency and Remedial Response, U.S. Environmental Protection Agency, Guidance: Cooperative Agreements and Contracts with States Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (P.L. 96–510)* ix-x (March 1982). This interpretation is consistent with both the legislative history and with the broad remedial goals of Superfund.

In *San-Lan Builders, Inc. v. Baxendale,* 28 *N.J.* 148 (1958), this Court recognized the need to look to the general tenor of the law:

> [I]n this quest for the true intention of the law, the letter gives way to the obvious reason and spirit of the expression, and to this end the evident policy and purpose of the act constitute an implied limitation on the sense of general terms and a touchstone for the expansion of narrower terms. * * * Scholastic strictness is to be avoided in the search for the legislative intention. The particular terms are to be made responsive to the essential principle of the law. It is not the words but the internal sense of the act that controls. Reason is the soul of law. *Wright v. Vogt,* 7 *N.J.* 1 (1951). [*Id.* at 155.]

Thus, as Judge Evers reasoned,

> [i]f § 114(c) is read to preempt *all* state taxation for hazardous waste cleanups, the clause would undermine the salutary statutory goals of [Superfund] and would result in actually limiting the number of cleanups which could otherwise be initiated by the state in spite of the fact that [Superfund] was intended to expand cleanup efforts. [4 *N.J.Tax* at 311 (emphasis added).]

In fact, the National Contingency Plan, prepared in accordance with section 105 of Superfund, 42 *U.S.C.A.* § 9605, provides for the listing of "at least four hundred of the highest priority facilities". 42 *U.S.C.A.* § 9605(8)(B).[10] However, the National Contingency Plan also recognizes the inability of Superfund to compensate all sites and therefore requires "criteria for determining priorities among releases or threatened releases throughout the United States for the purpose of taking remedial action * * *." 42 *U.S.C.A.* § 9605(8)(A). Thus, some sites in need will not make the priority list and will therefore not be eligible for Superfund compensation. *See* 40 *C.F.R.* § 300.68(a). Hence, there will no doubt be sites that are excluded from the section 114(c) test of "may be compensated under this subchapter." 42 *U.S.C.A.* § 9614(c); *see also* 4 *N.J.Tax* at 312 n.9 (stating that at that time only twelve of New Jersey's 235 sites were qualified for priority treatment). Given the national interest in cleaning up and removing hazardous

---

[10] 42 *U.S.C.A.* § 9605(8)(B) provides that the President shall list national priorities among known or threatened releases throughout the United States and shall revise the list "no less often than annually." In performing this function the President "shall consider any priorities established by the States."

waste from our environment, we would be hard pressed to interpret the legislation as prohibiting states from supplementing the federal movement to combat this problem. As the Tax Court stated, "[i]t simply strains credulity to say that hazardous waste sites or spills not meeting the [priority list] criteria are claims which 'may be compensated' under [Superfund]." 4 *N.J.Tax* at 313.

### III

The Tax Court emphasized that the underlying scheme of Superfund is one that "allows, but does not require, cooperation of the federal and state regimes." *Id.* at 315. A thorough understanding of this cooperative relationship leads us to the natural conclusion that section 114(c) of Superfund does not preempt Spill Fund in respect of funds that are used to compensate hazardous-waste cleanup costs and claims not covered or not in fact compensated by Superfund moneys. While we are mindful of "the obvious limitation that a double tax could not be collected and expended on any one project," *id.* at 320, we have no doubt that Congress' enactment of Superfund was aimed at providing a federal framework to supervise the revitalization of our environment. Surely Congress did not intend for the states just to sit back and wait for hazardous-waste compensation that might never be awarded.

The more logical conclusion, based particularly on the legislative history surrounding the enactment of Superfund, is that Congress contemplated that the federal government would attempt to deal with the problems of the most seriously affected sites (those listed in accordance with the National Priority Plan) and to allow states to maintain a compensation fund, or to use general revenues should they choose, to conduct their own cleanup efforts on those sites not receiving Superfund compensation and to provide for their cooperative program components including their 10% share of cleanup costs, related administrative costs for equipment and personnel, and other program

features not covered by Superfund such as containment and indemnity.

We therefore hold that the Spill Fund tax imposed on plaintiffs is not preempted by section 114(c) of Superfund insofar as Spill Fund is used to compensate hazardous-waste cleanup costs and related claims that are either not covered or not actually paid under Superfund. The underlying intent of Superfund, as well as the legislative history, mandates a conclusion of no preemption.

Affirmed.

*For affirmance*—Justices CLIFFORD, SCHREIBER, HANDLER and POLLOCK, and Judge FRITZ—5.

*For reversal*—None.